STATE OF CONNECTICUT *v.* EDWARD R. GRANT
(SC 18005)

Rogers, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

500

Argued January 8—officially released April 22, 2008

*Kent Drager*, senior assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark* and *Gary Nichol-*

*son,* senior assistant state's attorneys, for the appellee (state).

*Opinion*

ROGERS, C. J. The defendant, Edward R. Grant, was convicted, after a jury trial, on charges of murder in violation of General Statutes § 53a-54a.[1] The trial court rendered judgment in accordance with the verdict and the defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3). The defendant claims on appeal that the trial court improperly: (1) denied his motion to suppress certain evidence seized as the result of a search warrant that the defendant claims was issued without a showing of probable cause in violation of his rights under the fourth amendment to the United States constitution;[2] (2) concluded that the state had not intentionally or recklessly omitted material facts from the search warrant and denied the defendant's motion for a hearing pursuant to *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); (3) denied the defendant's motion to suppress certain

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

At the time that the offense was committed, murder was prohibited by General Statutes (Rev. to 1972) § 53a-54. That statute is substantively identical to § 53a-54a. See *State* v. *Rodriguez,* 180 Conn. 382, 381 n.1, 429 A.2d 919 (1980). For convenience, we refer to § 53a-54a in this opinion. The defendant points out that the information and judgment file cite § 53a-54a instead of General Statutes (Rev. to 1972) § 53a-54 and he requests that this clerical error be corrected. Because a clerical error in a judgment may be corrected at any time; see *State* v. *Wilson,* 199 Conn. 417, 436, 513 A.2d 620 (1986); and because the state does not object to the defendant's request, we conclude that the case should be remanded to the trial court for correction of the clerical errors in the information and judgment file.

[2] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

statements made by the defendant on the ground that the statements were the result of an unlawful custodial interrogation in violation of his rights under the fifth amendment to the United States constitution;[3] and (4) admitted testimony by several witnesses that they had observed bloodstains at the scene of the murder. The defendant further claims that the state engaged in prosecutorial impropriety during closing arguments thereby depriving him of his due process right to a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the morning of July 16, 1973, Timothy Woodstock and Frederick Petzold III, sixteen year old cousins, parked their vehicle on the eighth level of the Temple Street parking garage (garage) in New Haven and went shopping. They returned to the garage shortly before 1 p.m. As they were about to get in their vehicle, they saw a man chasing a woman on level nine of the garage. The man was trying to grab the woman and the woman let out "one long scream . . . ." The man and woman disappeared from sight behind an elevator shaft. Several seconds later, Woodstock saw the man running back to a blue Buick Electra (Buick) that had been parked on level nine. He was carrying in his hand a shiny object, five to six inches long. Petzold walked up to level nine of the garage and then up to level ten to investigate, but saw nothing amiss. Petzold and Woodstock then left the garage.

Jane Merold, Gary Hyrb and Ivan Hodes, who worked near the garage, had taken a lunch break together on the tenth level. At the end of their break, at about 1 p.m., they started to walk down to level nine. They saw a blue car, which Merold later identified as the Buick,

---

[3] The fifth amendment to the United States constitution provides in relevant part that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself . . . ."

speeding toward them on level nine. The car passed them and went up to level ten.

At 1:01 p.m., a man drove up to the exit booth on the floor level of the garage and, with his right hand, handed a bloody parking ticket to the attendant, Christopher Fagan. Fagan described the car that the man was driving as a green or blue Chrysler or General Motors vehicle. It appeared to Fagan that the man might have injured his left hand. The man appeared to be upset and Fagan asked him if he needed assistance. The man said "no thank" in what sounded to Fagan like a foreign accent. After he paid the parking fee and accepted the change with his right hand, the man drove away.

At about 1 p.m., William Wyant, an employee of the New Haven Parking Authority, discovered the body of the victim, twenty-two year old Concetta Serra, in a stairwell on level nine of the garage. Wyant ran to an office on the third level of the garage and directed a coworker to call the police. Several members of the New Haven police department responded to the call. They arranged for the victim's body to be sent to Yale-New Haven Hospital and an autopsy was performed that afternoon. It was determined that the victim had bled to death as the result of a single stab wound to her chest. The victim also had a cut on her finger and several bruises and abrasions on her right temple, right forehead, right knee and left ankle. The victim had type A blood.

As the police were investigating the crime scene that afternoon, Hyrb, who had heard about the murder, approached them and led them to the Buick on the eighth level of the garage where he had seen the driver abandon it. It was later determined that the victim had driven to the garage in the Buick, which was owned by her father. There was blood on the exterior driver's

side door, window and door handle and on the interior of the car near the left side of the driver's seat. A box of tissues located in the footwell directly behind the driver's seat also had blood on it. Blood also was present on the concrete floor of the garage next to the driver's side of the car and a trail of blood drops led away from the car down to the fifth level of the garage and then back up to a parking area on the seventh level. The police found the keys to the Buick and a man's white handkerchief, both bloodied, near the end of the blood trail. Testing of several blood samples taken from the handkerchief, the interior and exterior of the victim's car and the blood trail revealed that the blood was type O human blood. In 1988, a type of DNA testing referred to as DQ Alpha was performed on a sample of blood taken from the interior of the victim's car. The tests revealed that the blood had a DQ Alpha type of 1.2, 3. Approximately 5 percent of the general population has type O blood with a DQ Alpha type of 1.2, 3.

The police were able to obtain a fingerprint from the tissue box found in the victim's car. After comparing the fingerprint to the approximately 70,000 fingerprints on file with the New Haven police department in 1973, investigators were unable to locate a match. In 1983, Henry C. Lee, then the chief criminalist at the state police forensic laboratory (forensic laboratory), determined that blood had been deposited on top of the fingerprint on the tissue box and concluded that the fingerprint had been placed before the blood had been deposited. There was no way, however, for Lee to determine the interval between the placement of the fingerprint and the deposit of the blood. They could have been deposited within the same second or months apart.

Christopher Grice, a criminalist in the fingerprint section of the forensic laboratory, became involved in the investigation into the victim's murder in 1983. From that time until 1997, he attempted on numerous occasions to

identify the tissue box fingerprint by comparing it to fingerprints of known origin. In 1997, by using a computer program known as the automated fingerprint identification system, Grice finally was able to match the tissue box fingerprint to the defendant's left thumbprint.[4]

Thereafter, Gerald Hanahan, an inspector with the state division of criminal justice, met with the defendant at the defendant's place of work and informed him that his fingerprint had been found at the scene of a crime that had been committed in New Haven twenty-five years earlier. Hanahan asked the defendant if he had spent any time in New Haven during that period and if he knew the victim or her family. The defendant told Hanahan that he went to New Haven occasionally on business but did not know the victim or her family. The defendant also told Hanahan that he had type O blood. Hanahan met with the defendant again the next day and asked him if he could explain the presence of his fingerprint on the tissue box. The defendant stated that he did not know why his fingerprint had been found there and that he had memory problems resulting from a head injury that he had received in the 1960s while in the military and medication prescribed for the injury. Thereafter, Hanahan obtained and executed a search warrant for a sample of the defendant's blood. The blood sample taken from the defendant was type O and had a DQ Alpha type of 1.2, 3, the same type as the blood that had been found at the crime scene.

Thereafter, the defendant was arrested and charged with the victim's murder. After the defendant's arrest,

---

[4] Grice used the automated fingerprint identification system, a statewide computerized fingerprint database that is also connected to the fingerprint database for the state of Rhode Island, to obtain a list of fingerprints that were similar to the fingerprint on the tissue box. Grice then visually compared the fingerprints on the list, which included the defendant's fingerprints, to the fingerprint on the tissue box and determined that the fingerprint on the box matched the defendant's.

the forensic laboratory performed DNA testing on several cuttings taken from the handkerchief that had been found at the crime scene.[5] One sample had a DNA profile that matched the defendant's. There was no way to determine whether the DNA had come from the blood on the handkerchief or from some other biological source such as skin cells. The expected frequency of this DNA profile in the general population was between one in 300 million and one in 6.9 trillion. A type of paint used primarily in aftermarket automotive applications also was discovered on a sample of material taken from the handkerchief. At the time of the murder, the defendant had worked as a vehicle painter in an autobody repair shop owned by his parents.

After a jury trial, the defendant was convicted of murder. This appeal followed. On appeal, the defendant claims that the trial court improperly: (1) denied his motion to suppress all evidence derived from the execution of the search warrant for a sample of the defendant's blood on the ground that there was no probable cause to issue the warrant; (2) denied his motion for a hearing pursuant to *Franks* v. *Delaware*, supra, 438 U.S. 154, on the ground that material facts were omitted from the application for the search warrant for a sample of the defendant's blood; (3) denied the defendant's motion to suppress certain statements made by the defendant while he was in custody after his arrest; (4) admitted testimony by several witnesses that substances that they observed at the crime scene were blood. He further claims that the state engaged in prosecutorial impropriety during closing arguments and that this deprived him of a fair trial. We address each claim in turn.

---

[5] The cuttings from the handkerchief were analyzed by a process known as polymerase chain reaction/short tandem repeats, or PCR/STR.

I

We first address the defendant's claim that the trial court improperly denied his motion to suppress all evidence derived from the execution of the search warrant for a sample of his blood. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. After the fingerprint on the tissue box was identified as the defendant's, Hanahan and John Torento, another inspector for the state division of criminal justice, executed an affidavit and application for a search warrant for a sample of the defendant's blood. The following information was contained in the affidavit. The victim had been killed with a single stab wound to her chest. She had type A blood. Type O blood with a DQ Alpha type of 1.2, 3 had been found at the scene of the murder and was believed to belong to the perpetrator. Five percent of the Caucasian population of the United States has type O blood with a DQ Alpha type of 1.2, 3. The defendant's fingerprint and type O blood had been found on a tissue box that had been recovered at the scene of the murder. The defendant had stated to the inspectors that he had type O blood and that he could not explain why his fingerprint was on the tissue box, but that he had worked as an insurance adjuster in the 1970s and that he had gone to New Haven occasionally on business. The victim's father, John Serra, also told the inspectors that he did not know the defendant and knew of no reason why the defendant would have been in Serra's Buick, which the victim had been driving on the day of the murder. Serra owned an automobile repair shop where the Buick had been kept in 1973. The victim's cousin, Joseph Serra, stated that he worked at the repair shop and that he occasionally had used the Buick to take insurance adjusters to a customer's vehicle for appraisal.

The search warrant affidavit concluded that, "[b]ased upon the foregoing facts and circumstances, the affiants have probable cause to believe that evidence, to wit: a blood sample and the results of a scientific analysis of that blood sample would be material evidence in establishing probable cause for murder . . . . Said evidence would not otherwise be available to the investigating officers. Without such evidence, it would be impossible to either scientifically identify or exclude with certainty or near certainty the [defendant] as the perpetrator of the homicide, while the results of such tests would do so." The affidavit further stated that "[s]aid seizure is to be performed by properly trained and qualified personnel in a safe and appropriate manner that poses no significant risk of injury (beyond that necessary to the procedure itself) or impairment of health to the [defendant] . . . ." The judge, *Spada, J.*, granted the search warrant application.

Before trial, the defendant filed a motion to suppress any evidence derived from his blood sample on the ground that there had been no probable cause to issue the search warrant. The defendant contended that there was an insufficient factual basis for a determination of probable cause because the affidavit had not set forth the factual basis for the statements that the type O blood found at the scene of the murder was the perpetrator's. He further contended that the fact that his fingerprint had been found on a movable object in the victim's car was not sufficient to establish probable cause. Finally, he contended that a showing of probable cause is not sufficient to obtain a search warrant for a blood sample. Rather, he argued, searches involving intrusion into the body are subject to a heightened " 'clear indication' " test. *Schmerber* v. *California*, 384 U.S. 757, 770, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966) (warrantless search incident to arrest that involves intrusion into body in absence of "clear indication" that

evidence will be found violates fourth amendment). After a hearing, the trial court denied the motion.

At the outset of our analysis, we set forth the proper standard of review. "Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's determination on [that] issue, therefore, is subject to plenary review on appeal." (Internal quotation marks omitted.) *State* v. *Buddhu*, 264 Conn. 449, 459, 825 A.2d 48 (2003), cert. denied, 541 U.S. 1030, 124 S. Ct. 2106, 158 L. Ed. 2d 712 (2004).

The fourth amendment to the United States constitution provides in relevant part that "no warrants shall issue, but upon probable cause . . . ." "We uphold the validity of [a search] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the magistrate's conclusion that probable cause existed. . . . [T]he magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate. Whe[n] the circumstances for finding probable cause are detailed, whe[n] a substantial basis for crediting the source of information is apparent, and when a magistrate has in fact found probable cause, the reviewing court should not invalidate the warrant by application of rigid analytical categories. . . .

"Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be

searched. . . . In determining the existence of probable cause to search, the issuing magistrate assesses all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . Probable cause, broadly defined, [comprises] such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." (Internal quotation marks omitted.) *State* v. *Buddhu*, supra, 264 Conn. 459–60. A search warrant affidavit must contain sufficient facts for the issuing judge to make an independent determination of the existence of probable cause. *State* v. *Darwin*, 161 Conn. 413, 417, 288 A.2d 422 (1971).

It is well established that the requirements of the fourth amendment apply to a governmental order for the taking of a blood sample. In *Schmerber* v. *California*, supra, 384 U.S. 758–59, the petitioner sought to suppress evidence derived from a blood sample that had been withdrawn from his body while he was hospitalized for treatment of injuries that he had suffered in an automobile accident. The blood sample had been taken without a search warrant, at the direction of a police officer who had arrested the petitioner for driving under the influence of alcohol. Id., 768–69. The state courts rejected the petitioner's claims that the taking of the blood sample violated his fourth amendment rights and he appealed from his conviction to the United States Supreme Court. Id., 759.

On appeal, the United States Supreme Court recognized that, because of the danger of concealed weapons and the impracticality of limiting a search to those objects, "there is an unrestricted right on the part of the [g]overnment . . . to search the person of the accused when legally arrested to discover and seize the

fruits or evidences of crime . . . ." (Internal quotation marks omitted.) Id., 769. The court concluded, however, that "[w]hatever the validity of these considerations in general, they have little applicability with respect to searches involving intrusions beyond the body's surface. The interests in human dignity and privacy which the [f]ourth [a]mendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search." Id., 769–70.

The United States Supreme Court ultimately concluded that the warrantless seizure of the petitioner's blood was "reasonable under the circumstances, because (1) the probable cause that justified the arrest also suggested the relevance and likely success of the blood test; (2) the time required to secure a warrant risked the destruction of evidence of intoxication through the body's normal absorption or elimination of alcohol; and (3) the blood test was performed in a reasonable manner, by a trained physician in a hospital environment according to accepted medical practices. [Id.], 770–72." (Internal quotation marks omitted.) *State* v. *Floyd*, 217 Conn. 73, 84, 584 A.2d 1157 (1991). In reaching this conclusion, the court also noted that the extraction of blood samples is "commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." *Schmerber* v. *California*, supra, 384 U.S. 771. Although *Schmerber* involved a warrantless search, the United States Supreme Court has applied its reasoning to cases involv-

ing search warrants.[6] See, e.g., *Winston* v. *Lee*, 470 U.S. 753, 763, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985).

In the present case, the defendant suggests that, under *Schmerber*, a search warrant for a blood sample is subject to a heightened evidentiary standard. Our research reveals, however, that courts that have considered the question have concluded that, under *Schmerber* and its progeny, a search warrant for the seizure of a routine blood sample constitutionally may be issued upon a showing of probable cause.[7] Indeed, *Schmerber* itself supports this conclusion. *Schmerber* v. *California*, supra, 384 U.S. 770 ("the facts which established probable cause to arrest in this case also suggested the required relevance and likely success of

---

[6] See 2 W. LaFave, Search and Seizure (4th Ed. 2004) § 4.1 (e), p. 457 ("it is apparent that [*Schmerber* bears] upon the question of when an intrusion into the body may be authorized by warrant, [because] the [United States Supreme Court] was concerned with aspects of the intrusion other than the failure to obtain a warrant"). In *Winston* v. *Lee*, 470 U.S. 753, 760, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985), the United States Supreme Court stated that, under *Schmerber*, "[t]he reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure." In making this determination, the court must consider "the extent to which the procedure may threaten the safety or health of the individual"; id., 761; "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity"; id.; and "the community's interest in fairly and accurately determining guilt or innocence." Id., 762.

[7] See *People* v. *Jones*, 30 Ill. App. 3d 562, 564, 333 N.E.2d 725 (1975) (search warrant for blood sample must be based on probable cause under *Schmerber*); *DeVaney* v. *State*, 259 Ind. 483, 488, 288 N.E.2d 732 (1972) (warrantless seizure of blood sample must be based on probable cause under *Schmerber*); *In the Matter of Lavigne*, 418 Mass. 831, 835–36, 641 N.E.2d 1328 (1994) (court may order taking of blood sample if state establishes probable cause to believe defendant committed crime and sample would aid investigation of crime); *State* v. *Oevering*, 268 N.W.2d 68, 72–74 (Minn. 1978) (warrantless seizure of blood sample must be based on probable cause under *Schmerber*); *Turner* v. *State*, 726 So. 2d 117, 126–27 (Miss. 1998) (same); *In the Matter of Abe A.*, 56 N.Y.2d 288, 297, 437 N.E.2d 265, 452 N.Y.S.2d 6 (1982) (*Schmerber*'s clear indication test satisfied by facts that would establish probable cause).

a test of petitioner's blood for alcohol").[8] Accordingly, we conclude that a search warrant for the taking of a routine blood sample by a medically qualified person satisfies the requirements of the fourth amendment when the warrant is supported by probable cause.[9]

We turn, therefore, to the defendant's claim in the present case that the trial court improperly determined

[8] The court in *Schmerber* used the "clear indication" language; *Schmerber* v. *California*, supra, 384 U.S. 770; merely to make a general distinction between the quantum of evidence that constitutionally would justify the warrantless seizure of an arrestee's blood from the quantum of evidence that would justify the warrantless search of an arrestee for the purpose of finding concealed weapons. Id., 769–70. In the latter case, there is *no* evidentiary requirement for a search of the arrestee if the arrest itself was lawful. Id. The court ultimately concluded that, under the particular circumstances of *Schmerber*, the seizure of the blood sample was lawful because the petitioner lawfully had been arrested for driving under the influence of alcohol and the evidence necessary for his arrest also established probable cause for the seizure of a blood sample. Id., 770–72. Thus, the "clear indication" test is the equivalent of the probable cause standard.

[9] One commentator has interpreted this court's decision in *State* v. *Acquin*, 177 Conn. 352, 416 A.2d 1209 (1979), as requiring "more evidence in support of an intrusion into a defendant's body than, say, an intrusion into his automobile." 2 W. LaFave, Search and Seizure (4th Ed. 2004) § 4.1 (e), p. 459; id., p. 459 n.100. In *Acquin*, the defendant had been charged with several murders. *State* v. *Acquin*, supra, 352. The state sought an order directing the taking of a blood sample from the defendant. Id. We held that, in the absence of any evidence establishing, "at the very least," that a red sticky substance found on the alleged murder weapons was blood, the state had failed to establish probable cause for the issuance of the order. Id., 355. LaFave's treatise states that "[o]ne would not expect a court to be so demanding if, for example, the question was whether the defendant's car could be searched for blood-stained effects," thereby suggesting that we applied a heightened standard. 2 W. LaFave, supra, § 4.1 (e), p. 459 n.100. Our decision in *Acquin*, however, was based on our conclusion that "[t]he 'nexus' required between the items to be seized and the criminal behavior was clearly not established under the facts presented here." *State* v. *Acquin*, supra, 355. Because there was *no* evidence that the perpetrator's blood had been found on the murder weapons, there was *no* basis in *Acquin* for a conclusion that the defendant's blood would "be of material aid in determining whether the defendant committed the offense charged . . . ." (Internal quotation marks omitted.) Id., 353. Accordingly, we disagree with LaFave's suggestion that *Acquin* imposed a heightened standard for the issuance of search warrants for blood samples.

that the search warrant for a sample of his blood was supported by probable cause. In support of this claim, the defendant contends that the search warrant affidavit did not contain any facts or circumstances from which the issuing judge reasonably could have inferred that the perpetrator's blood had been found at the crime scene. The defendant further contends that the affidavit contained no information from which the issuing judge could have concluded that the defendant was connected with the crime. We disagree.

We first address the defendant's claim that the search warrant affidavit set forth no facts from which the issuing judge reasonably could have inferred that the perpetrator's blood had been found at the crime scene. The defendant contends that the statements in the search warrant affidavit that the victim had been stabbed to death, that her blood was type A and that type O blood had been found at the crime scene, did not preclude a finding that the type O blood belonged to another, unmentioned victim or to a person unconnected with the crime. In determining whether the search warrant was supported by probable cause, however, the trial court was not required to consider whether some *possible* state of facts that was consistent with the facts presented in the affidavit would preclude a finding of probable cause. The court was required only to consider whether the facts presented in the affidavit "would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe" that the type O blood belonged to the perpetrator. (Internal quotation marks omitted.) *State* v. *Buddhu*, supra, 264 Conn. 460. In the absence of any facts to the contrary—and the defendant does not claim that any such facts existed and were omitted from the affidavit—we conclude that the fact that blood was found at the scene of the murder that did not belong to the victim was sufficient to persuade an impartial and reasonable per-

son reasonably to believe that the blood belonged to the perpetrator.[10]

We also reject the defendant's claim that the search warrant affidavit failed to connect the defendant to the crime scene. The defendant contends that the statements in the affidavit that the defendant's fingerprint had been found on the tissue box in the victim's car and that neither the defendant nor the victim's family could explain why the fingerprint was there were not sufficient to support a reasonable belief that the defendant had been at the crime scene because the tissue box was movable and because the statements did not establish when the fingerprint was placed on the box.[11]

---

[10] The defendant repeatedly emphasizes that, to establish probable cause, the state must establish that "the particular items sought to be seized *are* connected with criminal activity . . . and . . . there is probable cause to believe that the items sought to be seized *will be* found in the place to be searched"; (emphasis added; internal quotation marks omitted) *State* v. *Buddhu,* supra, 264 Conn. 460; thereby suggesting that the facts supporting a finding of probable cause must give rise to a belief rising to the level of certainty. We have held in other contexts, however, that "proof of probable cause requires less than proof by a preponderance of the evidence." See, e.g., *State* v. *Munoz,* 233 Conn. 106, 135, 659 A.2d 683 (1995) (considering whether state had established probable cause at hearing conducted pursuant to General Statutes § 54-46a). Thus, to establish probable cause in the present case, the state was not required to present facts sufficient to support a reasonable belief that it was more likely than not that the type O blood belonged to the perpetrator, much less that that fact was certain.

[11] *State* v. *Payne,* 186 Conn. 179, 182, 440 A.2d 280 (1982) ("[u]nless it can be shown that the circumstances are such that the fingerprints could have been impressed only at the time the crime was perpetrated, the presence of the defendant's fingerprints [at the crime scene] does not establish his connection with the crime" [internal quotation marks omitted]); *State* v. *Mayell,* 163 Conn. 419, 426, 311 A.2d 60 (1972) (same); see also *United States* v. *Van Fossen,* 460 F.2d 38, 41 (4th Cir. 1972) ("[t]o warrant conviction the trier of fact must be able to reasonably infer from the circumstances that the fingerprints were impressed at the time the crime was committed"); *United States* v. *Corso,* 439 F.2d 956, 957 (4th Cir. 1971) ("[t]he probative value of an accused's fingerprints upon a readily movable object is highly questionable, unless it can be shown that such prints could have been impressed *only* during the commission of the crime" [emphasis in original]); *Jones* v. *State,* 833 S.W.2d 118, 124 (Tex. App. 1992) (presence of fingerprints at crime scene did not constitute probable cause to arrest), cert. denied, 507 U.S. 921, 113 S. Ct. 1285, 122 L. Ed. 2d 678 (1993).

The defendant contends that it was possible that he left his fingerprint on the tissue box while it was in the store before sale. He further contends that it was possible that he had been in the Buick in connection with his work as an insurance adjuster.

We are not persuaded. In most of the cases relied on by the defendant, the courts held that fingerprint evidence with a possible innocent explanation was insufficient to support a finding of guilt *beyond a reasonable doubt.*[12] The mere possibility of an innocent explanation for evidence connecting a defendant with a crime does not, however, preclude a finding of probable

[12] *State* v. *Payne,* 186 Conn. 179, 184, 440 A.2d 280 (1982); *State* v. *Mayell,* 163 Conn. 419, 428, 311 A.2d 60 (1972); see also *United States* v. *Van Fossen,* 460 F.2d 38, 41 (4th Cir. 1972); *United States* v. *Corso,* 439 F.2d 956, 957–58 (4th Cir. 1971).

The only other case relied on by the defendant, *Jones* v. *State,* 833 S.W.2d 118 (Tex. App. 1992), cert. denied, 507 U.S. 921, 113 S. Ct. 1285, 122 L. Ed. 2d 678 (1993), is also distinguishable. In that case, the following statements by a police detective were included in an arrest warrant affidavit: "During the course of my investigation a suspect identified as [the defendant] developed. The finger prints of [the defendant] were compared to prints lifted from the crime scene and a positive match was made.

"It is [my] belief that [the defendant], intentionally and knowingly, caused the death of [the victim] . . . ." (Internal quotation marks omitted.) Id., 124. The court concluded that the detective had merely made "conclusory statements as to who may have been involved in the crime and what [the defendant] may have done." Id. He had not "set forth the underlying facts that led him to make these conclusions. Hence, there were no facts that would lead a neutral and detached magistrate to conclude that [the defendant] was the perpetrator of the crime . . . ." Id. Accordingly, the court concluded that the affidavit was insufficient to support a finding of probable cause to arrest. Id.

*Jones* is distinguishable from the present case because there were *no* facts in the arrest warrant affidavit in *Jones* from which the court could have assessed whether there was an innocent explanation for the presence of the fingerprints at the crime scene. In the present case, the search warrant affidavit stated that the defendant had not been able to explain the presence of his fingerprint at the crime scene. It further stated the defendant had been an insurance adjuster and that the Buick had occasionally been used to transport insurance adjusters in the 1970s. Thus, the issuing judge was able to consider the relative probability of an innocent explanation.

cause. See *Johnson* v. *Lewis*, 120 Cal. App. 4th 443, 453, 15 Cal. Rptr. 3d 507 (2004) (possibility of innocent explanation does not vitiate probable cause); *Peterkin* v. *United States*, 281 A.2d 567, 569 (D.C. App. 1971) (mere possibility of innocent explanation does not negate finding of probable cause); *People* v. *Hartman*, 294 App. Div. 2d 446, 447–48, 744 N.Y.S.2d 38 (2002) (because probable cause does not require proof beyond reasonable doubt, possibility of innocent explanation does not preclude finding of probable cause). In the present case, the search warrant affidavit contained sufficient facts for an impartial and reasonable mind to weigh the probability of an innocent explanation for the fingerprint and reasonably to support a belief that such an explanation was no more likely than the defendant's presence in the Buick at the time of the murder, for which there was *no* apparent innocent explanation. Accordingly, we conclude that the trial court properly determined that the search warrant was supported by probable cause.

## II

We next address the defendant's claim that the trial court improperly concluded that the state had not intentionally or recklessly omitted material facts from the search warrant affidavit and, therefore, denied his motion for a hearing pursuant to *Franks* v. *Delaware*, supra, 438 U.S. 154. We disagree.

The following procedural history is relevant to our resolution of this claim. Before trial, the defendant filed a motion for a hearing pursuant to *Franks* in which he claimed that the state had omitted numerous material facts from the search warrant affidavit. Specifically, the defendant claimed that the affidavit omitted facts showing that: (1) several identifiable fingerprints were located in or on the Buick and were identified as not belonging to the defendant; (2) an earlier search war-

rant affidavit directed against another suspect had stated that investigators had never substantiated that the fingerprints at the crime scene belonged to the perpetrator; (3) the fingerprint on the tissue box had been deposited before the blood on the box had been deposited; (4) the tissue box had been in the Buick for three weeks before the murder and, before that, had been in the home of a friend of the victim's; (5) a number of eyewitness descriptions of the perpetrator did not match the defendant's appearance; (6) investigators believed that the perpetrator had injured his left hand and would be likely to have a scar; (7) another suspect, who had been identified by an eyewitness, had had " 'domestic disputes' " with the victim shortly before her death; and (8) reference in the affidavit to a suspect whose blood had similar genetic markings to the blood found at the crime scene were to another suspect, not to the defendant. The trial court denied the motion on the ground that, although the omitted information arguably would have cast suspicion on two other suspects, it would not have defeated a finding of probable cause to seize a sample of the defendant's blood. After trial, the defendant filed a motion for a new trial in which he claimed that the trial court improperly had determined that the omission of certain facts from the search warrant affidavit had not affected the finding of probable cause. The trial court also denied that motion.

"In *Franks* v. *Delaware*, supra, [438 U.S.] 155–56, the United States Supreme Court held that where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, *and* if the allegedly false statement is necessary to the finding of probable cause, the [f]ourth [a]mendment requires that a hearing be held at the defendant's request. . . . The court in *Franks* mentioned only a false statement . . . included . . .

in the warrant affidavit; subsequent cases, however, have extended *Franks* to include material omissions from such an affidavit." (Emphasis in original; internal quotation marks omitted.) *State* v. *Weinberg*, 215 Conn. 231, 237, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990).

"Not all omissions, however, even if intentional, will invalidate an affidavit. . . . In fact, an affiant may omit facts that he believes to be either immaterial or unsubstantiated. . . . Thus, before a defendant is entitled to a *Franks* hearing for an alleged omission, he must make a substantial preliminary showing that the information was (1) omitted with the intent to make, or in reckless disregard of whether it made, the affidavit misleading to the issuing judge, and (2) material to the determination of probable cause. . . . Even if the affiant 'picks and chooses' the information that he includes in the affidavit, there is no *Franks* violation if, had the magistrate been so advised, he still would have been justified in issuing the warrant." (Citations omitted.) *State* v. *Bergin*, 214 Conn. 657, 666–67, 574 A.2d 164 (1990). "When reviewing whether a *Franks* hearing is warranted, we recognize that there is a longstanding rule that there is an underlying presumption of validity with respect to the affidavit supporting a warrant." (Internal quotation marks omitted.) Id., 666. "In summary, there can be no *Franks* violation when the omissions, if included in the arrest warrant affidavit, would not defeat probable cause." Id., 671.

The defendant in the present case focuses primarily on his claim that the search warrant affidavit improperly omitted facts showing that the fingerprint had been placed on the tissue box before the blood. The defendant contends that, although this did not "make it impossible for the defendant to be the perpetrator . . . it does make it impossible to infer or to conclude . . . that there was probable cause to believe that [the]

defendant's print was impressed on the box at the time of the crime . . . ." We disagree. The fact that the fingerprint was deposited on the tissue box before the blood meant only that it was *possible* that the fingerprint had an innocent explanation, a possibility that reasonably could have been inferred from other statements in the affidavit, namely, that state inspectors had asked the defendant and the victim's family about possible explanations for the fingerprint. There would have been no need for such inquiries if the investigation had established that the fingerprint and the blood had been deposited simultaneously. We concluded in part I of this opinion that the facts in the affidavit were sufficient for an impartial and reasonable mind to weigh the probability of an innocent explanation for the fingerprint and reasonably to support a reasonable belief that such an explanation was no more likely than the defendant's presence in the Buick at the time of the murder. Accordingly, we conclude that the inclusion of facts indicating that the fingerprint had been deposited on the tissue box before the blood would not have defeated a finding of probable cause.

The defendant also claims that the affidavit improperly omitted the facts that eyewitness descriptions of the perpetrator did not match the defendant, whereas the eyewitness descriptions did match other suspects who had other possible connections to the victim and the crime scene. Our careful review of the record satisfies us that none of these facts was inconsistent with the facts contained in the search warrant affidavit or would have defeated a reasonable belief that the defendant was connected with the crime scene and that a sample of his blood would be of assistance in solving the crime.[13] Although the facts may have constituted

---

[13] Although the eyewitness descriptions of the perpetrator were not entirely consistent with each other or with the defendant's appearance, none of the descriptions definitively ruled out the defendant as a suspect. All of the eyewitnesses described the perpetrator as a white male with dark hair. They gave varying heights between five feet eight inches and five feet eleven

potentially exculpatory evidence, there is no constitutional requirement that all potentially exculpatory evidence must be included in a search warrant affidavit. See *United States* v. *Colkley*, 899 F.2d 297, 302–303 (4th Cir. 1990). Accordingly, we conclude that the trial court properly determined that the facts omitted from the search warrant affidavit were not material under *Franks* and, therefore, the trial court properly denied the defendant's motion for a *Franks* hearing.

### III

We next address the defendant's claim that the trial court improperly denied his motion to suppress statements made by the defendant on the ground that the statements were the result of an unlawful custodial interrogation in violation of his fifth amendment rights. We disagree.

The trial court's memorandum of decision on the motion to suppress sets forth the following undisputed facts relating to the defendant's claim. On June 24, 1999, James Rovella and Peter Fearon, inspectors with the office of the chief state's attorney, served an arrest warrant on the defendant at his home in Waterbury. Rovella and Fearon were familiar with the case and knew or should have known that the defendant previously had used the services of William St. John, an attorney, in connection with the case. The inspectors had not informed St. John about the pending arrest. When Rovella told the defendant that he had a warrant for the defendant's arrest, the defendant stated, " 'I told you people I didn't know that girl.' " The defendant then told an unidentified woman, apparently the defendant's

inches tall, weights between 150 pounds and 185 pounds and ages between twenty-one and twenty-seven years old. The search warrant affidavit indicated that the defendant is a white male who is five feet six inches tall, weighs approximately 145 pounds and was born on October 4, 1942, making him thirty years old at the time of the murder.

wife or girlfriend, to " 'call the lawyer.' " Fearon gave the woman his business card so that the attorney could contact him. The defendant was then handcuffed and placed in a police car.

The memorandum of decision states that Fearon and Rovella drove the defendant to the Bethany state police barracks (barracks). Fearon drove and Rovella sat with the defendant in the backseat. Rovella informed the defendant of his *Miranda* rights[14] and asked the defendant if he understood them. The defendant stated that he did. Rovella then told the defendant that it was his choice whether to speak with the police officers without the presence of an attorney. The defendant responded that an attorney was being called and said, " 'Maybe I should wait.' "

Without any further prompting by Rovella, the defendant then stated that he believed that the matter had been concluded the last time that he had spoken to investigators. He also stated that the investigators had informed him that his fingerprint had been found in the car that the victim had been driving on the day of the murder and that he had no idea why his fingerprint was in the car. Rovella then told the defendant that his blood also had been found in the victim's car and in the garage. The defendant made no further statements at that time.

After Fearon, Rovella and the defendant arrived at the barracks, Fearon presented the defendant with a written notice of his *Miranda* rights. The defendant read the form and initialed the various rights, indicating that he understood them. The form did not contain an express waiver provision and the defendant was not asked expressly whether he waived his rights.

---

[14] *Miranda* v. *Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed").

Thereafter, Rovella asked the defendant if he wanted to be interviewed without the presence of an attorney. The defendant responded that he wanted to speak to an attorney and that his girlfriend would locate the attorney who previously had represented him. The defendant then said to Rovella, " 'Did you read about the guy in Texas that killed all those people? They got him on a fingerprint too.' " Rovella replied that he had heard about the case. The defendant then said, " 'I couldn't begin to tell you where I was when she was murdered or even who I was with.' " He also stated that he used to do business in New Haven as an insurance adjuster and at an auto paint store when he worked at his family's auto body shop in Waterbury. He further stated that he had been injured while in the Army and had "plates" in his head. He occasionally went to the Veteran's Hospital in West Haven. He stated that he would find himself driving around and would not know how he got there and said, " 'I just had blackouts and wouldn't remember. I really don't know.' "

Before trial, the defendant filed a motion to suppress these statements on the ground that he had made the statements without a voluntary, knowing and intelligent waiver of his *Miranda* rights, and that he had made them outside the presence of counsel after adversarial judicial proceedings had commenced.[15] The trial court denied the motion to suppress on the ground that the defendant had made the statements voluntarily and not as the result of police interrogation.

On appeal, the defendant claims that the trial court improperly denied his motion to suppress the statements that he made at the barracks. The defendant contends that he made the statements as the result of

---

[15] The defendant also sought to suppress other statements that he made at the barracks. The trial court granted that portion of the motion to suppress and those statements are not at issue in this appeal.

Rovella's comment while driving to the barracks that the defendant's blood had been found at the scene of the crime. He argues that Rovella's comment constituted an illegal interrogation.

"In *Rhode Island* v. *Innis*, 446 U.S. 291, 300–302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the United States Supreme Court concluded that, the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. *A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.* But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (Emphasis in original; internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 398–99, 908 A.2d 506 (2006).

A number of courts have held that, if the police confront a suspect with incriminating evidence against him for the purpose of eliciting an incriminating response, the conduct constitutes an interrogation under

*Miranda* and *Innis*.[16] A number of courts also have held that, if the police inform a suspect of the evidence against him as an ordinary incident of arrest and custody, the conduct does not constitute interrogation.[17] Several courts have expressed doubts as to whether the latter rule is consistent with *Innis*.[18] We are persuaded, however, that a per se rule that confronting a suspect with incriminating evidence constitutes interrogation is not required under *Innis*. Rather, whether such conduct constituted an interrogation depends on whether it was a normal incident of arrest and custody or, instead, was intended to elicit an incriminating response. *Rhode Island* v. *Innis*, supra, 446 U.S. 301 ("the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police [*other than those normally attendant to arrest and custody*] that the police should know are reasonably likely to elicit an incriminating response" [emphasis added]); see also *United States* v. *Crisco*, 725 F.2d 1228, 1232 (9th Cir.), cert. denied, 466 U.S.

---

[16] See *United States* v. *Szymaniak*, 934 F.2d 434, 439 (2d Cir. 1991); *People* v. *Sims*, 5 Cal. 4th 405, 443–44, 853 P.2d 992, 20 Cal. Rptr. 2d 537 (1993) (when confronting defendant with incriminating evidence was nonresponsive to defendant's inquiries about procedure, conduct constituted interrogation), cert. denied, 512 U.S. 1253, 114 S. Ct. 2782, 129 L. Ed. 2d 893 (1994); *People* v. *Ferro*, 63 N.Y.2d 316, 323–24, 472 N.E.2d 13, 482 N.Y.S.2d 237 (1984) (when only possible object of police action in revealing evidence to defendant was to elicit statement, conduct constituted interrogation), cert. denied, 472 U.S. 1007, 105 S. Ct. 2700, 86 L. Ed. 2d 717 (1985).

[17] See *United States* v. *Crisco*, 725 F.2d 1228, 1232 (9th Cir.), cert. denied, 466 U.S. 977, 104 S. Ct. 2360, 80 L. Ed. 2d 832 (1984) (when federal agent related incriminating evidence in response to defendant's statements that he did not understand why he was being arrested, conduct did not constitute interrogation); cf. *Rhode Island* v. *Innis*, supra, 446 U.S. 301 (conduct likely to elicit incriminating response after defendant has requested counsel is unconstitutional unless it is "normally attendant to arrest and custody").

[18] See *Nelson* v. *Fulcomer*, 911 F.2d 928, 935–36 (3d Cir. 1990) (noting tension between cases holding that confronting suspect with incriminating evidence constitutes interrogation and cases holding that, if conduct was attendant to arrest and custody, it was not interrogation); *Anderson* v. *Smith*, 751 F.2d 96, 104 (2d Cir. 1984) (same).

977, 104 S. Ct. 2360, 80 L. Ed. 2d 832 (1984). This is a fact-bound determination that must be made on a case-by-case basis. *United States* v. *Crisco*, supra, 1230. When the historical facts are undisputed, whether those facts meet the test for a custodial interrogation is a question of law subject to plenary review. See *State* v. *Pinder*, 250 Conn. 385, 410–12, 736 A.2d 857 (1999).

The United States Supreme Court has not defined what type of conduct is considered to be "normally attendant to arrest and custody . . . ." *United States* v. *Crisco*, supra, 725 F.2d 1232. The Ninth Circuit Court of Appeals has concluded, however, that when, at the time of arrest, an officer responds to an arrestee's confusion or curiosity by informing him "of circumstances which contribute to an intelligent exercise of his judgment, this information may be considered normally attendant to arrest and custody." Id. (when defendant acted bewildered upon arrest and stated that he did not understand charges, police officer's statement that he had met with defendant to negotiate drug deal did not constitute interrogation, but was intended to be informative and was attendant to arrest and custody). In contrast, to constitute a custodial interrogation under *Miranda*, police conduct must work "to undermine the individual's will to resist and to compel him to speak . . . ." (Internal quotation marks omitted.) Id. Accordingly, we conclude that factors to be considered in determining whether confronting a defendant with incriminating evidence was conduct "normally attendant to arrest and custody"; id.; or, instead, constituted a custodial interrogation, include: the timing of the conduct, i.e., whether it was done at or near the time of arrest; whether the police reasonably could have believed that the defendant desired information regarding the reasons for his arrest in order to make intelligent decisions about such matters as whether to waive his fifth amendment right, whether to request the services

of an attorney and whether to advise his family and associates of his arrest; whether the police conduct was, in fact, meaningfully responsive to the defendant's desire for information; and whether there is any evidence that the police intended to compel the defendant to speak. We emphasize that, if the circumstances would tend to support a finding that the police conduct was of a type normally attendant to arrest and custody, the court's focus should be on whether the primary *purpose* of the police officer in confronting the defendant with the incriminating evidence was to elicit an incriminating response instead of whether the conduct was reasonably likely to elicit an incriminating response. *Innis* expressly recognized that words and actions normally attendant to arrest and custody may be reasonably likely to elicit an incriminating response without constituting an interrogation. *Rhode Island* v. *Innis*, supra, 446 U.S. 301–302; cf. *People* v. *Ferro*, 63 N.Y.2d 316, 323–24, 472 N.E.2d 13, 482 N.Y.S.2d 237 (1984) (when *only possible* object of police action in revealing evidence to defendant was to elicit statement, conduct constituted interrogation). We further note that none of these factors is dispositive and the weight to be given to each depends on the particular facts and circumstances of each case.

We conclude in the present case that the trial court properly determined that Rovella's comment to the defendant that his blood had been found at the scene of the crime did not constitute an interrogation under *Innis*. Rovella made the comment *in response* to the defendant's statements that he had understood that the investigation against him had concluded and that he had no idea why his fingerprint had been found in the victim's car. Thus, Rovella reasonably could have believed that the defendant was confused or curious about the reasons for his arrest. The most reasonable understanding of Rovella's comment, therefore, is that

he was merely responding to the defendant's implicit question regarding the basis for his arrest, thereby providing information to the defendant that was necessary for "an intelligent exercise of his judgment" as to "what course of action to take." *United States* v. *Crisco*, supra, 725 F.2d 1232. Rovella did not, implicitly or explicitly, ask for any response from the defendant and made no further comments to the defendant during the remainder of the drive to the police barracks, even though the defendant remained silent. If Rovella had intended to elicit an incriminating response by confronting the defendant with the evidence against him, presumably he would have reacted to the defendant's silence with additional comments or questions. We conclude, therefore, that Rovella's comment in response to the defendant's statements was not calculated to elicit an incriminating response from the defendant but was attendant to the defendant's arrest and custody. Accordingly, we conclude that the comment did not constitute interrogation.

The defendant further contends, however, that the state ethically is barred from denying that Rovella's comment constituted interrogation because it argued to the trial court that the defendant's statements at the barracks were the result of Rovella's comment. The following additional procedural history is relevant to this claim. At trial, the defendant moved to preclude Rovella from testifying about his comment to the defendant that his blood had been found at the crime scene. The defendant argued that the testimony was inadmissible because: (1) it was hearsay; and (2) the defendant's response to the comment was silence, which could not be used against him under the fifth amendment. In response, the state argued that Rovella's testimony was not hearsay because it was not being introduced to establish the truth of the statement, and that the state did not intend to bring attention to the defendant's

silence. Rather, the state argued, the testimony was required so that the jury could understand the context of the defendant's remark at the barracks that "[t]hey got [the murderer in Texas] on a fingerprint too." Specifically, the state argued that Rovella's testimony was "simply a statement that now [the defendant] has that information [that his blood had been found at the crime scene], whether he knew it before or not is up for this jury." Thus, the state appeared to argue that the defendant's remark that "[t]hey got him on a fingerprint too" could best be understood and evaluated by the jury if the jury was informed that the defendant knew, when he made the statement, that the police were in possession of significant evidence of his guilt. The court denied the defendant's motion to preclude the testimony.

Although we agree with the defendant that the state's argument at trial suggests that it saw some causative link between Rovella's comment that the defendant's blood had been connected to the crime scene and the defendant's "[t]hey got him on a fingerprint too" remark, such a causative link is not sufficient to establish that Rovella's comment constituted interrogation. Rather, because Rovella's comment was attendant to arrest and custody, in order to establish that it constituted interrogation, the defendant was required to show that Rovella's purpose in making the comment was to elicit an incriminating response, and not to inform the defendant of a circumstance that might contribute to an intelligent exercise of his judgment at the time of arrest. We have concluded that he did not intend to elicit an incriminating response. Accordingly, we reject this claim and conclude that the trial court properly denied the defendant's motion to suppress the statement that he made at the barracks.

## IV

We next address the defendant's claim that the trial court improperly admitted testimony by several witnesses that certain substances and stains that had been observed at the crime scene were blood, in the absence of any scientific testing of the substances. Specifically, he claims that the trial court improperly admitted the testimony of several witnesses that they had observed a trail of blood leading from the victim's car to the area where the keys and the handkerchief were found and that the keys were bloody.[19] We disagree.

The following procedural history is relevant to our resolution of this claim. Before trial, the defendant submitted a motion in limine in which he requested that the trial court preclude the state from introducing "[a]ny reference to any blood-like substance or stain observed by any witness as 'blood,' unless there is sufficient evidence to establish that such item has been tested to be blood . . . ." After hearing arguments on the motion, the trial court concluded that "a lay witness or, indeed, an expert witness who believes that he has seen blood either at the scene or at some site or item is allowed to testify to that opinion, subject to cross-examination, and the potential [refutation] by other evidence." Accordingly, the court denied the motion in limine with respect to the blood evidence. At trial, various witnesses testified that they personally had observed blood in the form of drops and smears on the parking ticket, on the

---

[19] The state argues that, because the defendant has not identified the specific testimony that he claims was improperly admitted, his claim is unreviewable. We disagree. In his statement of facts, the defendant discusses generally the testimony concerning blood that was observed on the Buick, on the floor of the garage, on a trail of blood drops winding through the garage and on the keys and handkerchief that were found near the end of the blood trail. The admissibility of this *type* of testimony is essentially a legal question. We conclude, therefore, that the defendant was not required to identify each particular testimonial statement that he claims was improperly admitted and that the claim is reviewable.

Buick, on the floor of the garage next to the Buick, in a trail of blood drops winding through the garage and on the keys and handkerchief that were found near the end of the blood trail.

The applicable standard of review for evidentiary challenges is well established. "Unless an evidentiary ruling involves a clear misconception of the law, the [t]rial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *Dinan* v. *Marchand*, 279 Conn. 558, 567, 903 A.2d 201 (2006).

We begin our analysis with a review of the development of our case law governing the admissibility of testimony that a substance appeared to be blood, in the absence of scientific testing. In *State* v. *Schaffer*, 168 Conn. 309, 318, 362 A.2d 893 (1975), the defendant claimed that the trial court improperly had admitted "the testimony of a witness which characterized as blood a stain she observed on a window of the defendant's car." The defendant argued that the witness had not been qualified as an expert in the identification of blood and, therefore, was incompetent to testify as to her opinion as to the nature of the stain. Id. This court concluded that "[i]t is permissible to admit into evidence the opinions of common observers in regard to common appearances, facts and conditions . . . in a great variety of cases. . . . When the question involved can be answered by the application of ordinary knowledge and experience, expert testimony is not required . . . although [t]o render opinions of common witnesses admissible it is indispensable that the opinions be founded on their own personal observation, and not [on] the testimony of others, or on any hypothetical

statement of facts, as is permitted in the case of experts." (Citations omitted; internal quotation marks omitted.) Id., 318–19. We concluded that, "[c]onsidering the substance identified, its location, and the normal human experience of the witness . . . the trial court did not abuse its discretion in determining that under the circumstances the witness was competent to give testimony characterizing as blood the stain she observed on the window of the defendant's car." Id., 319.

In *State* v. *Moody*, 214 Conn. 616, 573 A.2d 716 (1990), the defendant claimed that the trial court improperly had admitted testimony by an expert witness that a stain found on one of the defendant's shoes had given a positive result on a " 'presumptive test for blood,' " which meant that the stain "could be human blood, animal blood or something other than blood." Id., 628. The stain had been "too small to have the actual test for blood administered to it." Id. We noted that "evidence is relevant only when it tends to establish the existence of a material fact or to corroborate other direct evidence in the case." (Internal quotation marks omitted.) Id. We then stated that "the result of the 'presumptive test for blood' had no probative value whatsoever. The test result did nothing toward establishing the likelihood of the presence of human blood on the sole of the defendant's shoe." Id. Accordingly, we concluded that "the test result was entirely irrelevant, and thus, the trial court abused its discretion by admitting it into evidence." Id.

In *State* v. *Whipper*, 258 Conn. 229, 277, 780 A.2d 53 (2001), overruled on other grounds by *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004), the defendant claimed that the trial court improperly had admitted testimony by two police detectives that, based on their personal observations, "a palm print found on a broken vase at the crime scene was made in blood despite the

police department's failure to perform the appropriate tests to ascertain whether the substance was in fact blood." An eyewitness had seen the defendant break the vase over the victim's head and, when the defendant was found hours after the attack, his hands had fresh wounds and were bloody. Id., 234–35. One of the witnesses, Michael A. Silva, "testified regarding his observations of [the crime scene] when he photographed and videotaped it and collected evidence pertaining to the crimes therein. Silva testified that he had discovered a palm print in blood on a broken vase he had found [at the crime scene]." Id., 277. The other witness, Robert Finkle, an expert in fingerprint examination and identification, testified that he had identified the bloody palm print on the vase as the defendant's. Id. He testified on cross-examination that the substance on the vase had reacted to certain chemical reagents consistently with the way the blood would react, but there were other substances that would have the same reaction. Id., 277–78. In reliance on *Moody*, this court concluded that, "in light of the state's failure to test the stain for the presence of blood, it was improper for the state's witnesses to testify . . . that the palm print found on the vase had been made in blood." Id., 281.

In the present case, the defendant contends that *Whipper* and *Moody* are inconsistent with *Schaffer* and, therefore, that *Schaffer* is no longer good law. The state contends that, to the contrary, *Whipper* and *Moody* merely preclude expert opinion testimony that a substance is blood based *solely* on a presumptive testing methodology. We agree with the defendant that *Whipper* is inconsistent with *Schaffer*. In *Whipper*, this court stated that the testimony of the police detectives, based on their personal observations, that the palm print on the vase had been made in blood was inadmissible because "it could not be determined *for certain* whether the stain was indeed blood." (Emphasis added.) *State*

v. *Whipper,* supra, 248 Conn. 281. In *Schaffer,* however, we had concluded that lay testimony based on personal observation that a substance on a car window *appeared* to be blood *was* admissible. We did not cite *Schaffer* in *Whipper,* but relied solely on our decision in *Moody.* Id. In *Moody,* however, this court had concluded only that expert testimony that a substance may have been human blood was inadmissible as nonprobative because it was based *solely* on a presumptive test that could not rule out the possibility that the substance was animal blood or some other substance. The stain at issue in *Moody* had been too small for more conclusive testing. Presumably, therefore, it had been too small for a person of ordinary knowledge or experience to make any reasonable inferences about its nature on the basis of personal observation.

Having concluded that *Whipper* and *Schaffer* are inconsistent, we are convinced that *Schaffer* sets forth the better rule. A person of ordinary knowledge and experience generally is competent to testify that a substance personally observed by that person appeared to be blood. Although the particular facts and circumstances surrounding the witness' observation of the substance might affect the weight to be given to the testimony, the fact that the substance was not subject to scientific testing to rule out any possibility that it was not blood does not render the testimony inadmissible. See *Jewett* v. *Jewett,* 265 Conn. 669, 680, 830 A.2d 193 (2003) ("[t]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight" [internal quotation marks omitted]). To the extent that we concluded to the contrary in *Whipper,* that conclusion is overruled.

In the present case, the defendant relies solely on *Moody* and *Whipper* in support of his claim that the trial court improperly admitted the testimony of several

witnesses that they had observed blood at the scene of the crime. As we have explained, however, *Moody* stands only for the proposition that, when the *sole* evidence that a substance was blood is the result of a presumptive testing method that does not rule out the possibility that the substance was not human blood, the evidence is nonprobative. In the present case, the testimony concerning blood that was found at the crime scene was based on personal observations by the witnesses under circumstances that would permit a person of ordinary knowledge and intelligence to conclude that the substances were blood. Thus, *Moody* is not applicable here. Instead, the testimony falls within the rule that we applied in *Schaffer*. Accordingly, we conclude that the trial court properly admitted the testimony.

V

We next address the defendant's claims that the prosecutor engaged in acts of prosecutorial impropriety during his closing arguments to the jury that deprived him of a fair trial. We disagree.

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . As we have indicated, our determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 361–62, 897 A.2d 569 (2006). "These factors include the extent to which the misconduct was invited by defense conduct or argument, the severity of the misconduct, the frequency of

the misconduct, the centrality of the misconduct to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." Id., 361.

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 367, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007).

With these principles in mind, we address each of the defendant's claims in turn.

A

The defendant first claims that the prosecutor improperly argued to the jury that it could infer the defendant's guilt from his failure to offer an innocent explanation for the presence of his fingerprint on the tissue box and his DNA on the handkerchief. He contends that these statements constituted an improper comment on his failure to testify and improperly shifted the burden of proof to the defendant.

The following undisputed facts are relevant to this claim. During closing arguments to the jury, the prosecutor stated that "[t]here is not one shred of evidence in this case offering an innocent explanation for [the defendant's] fingerprint being on that tissue box. And there is not one shred of evidence offering an innocent explanation for his DNA being on that bloody handkerchief." The defendant objected to this language on the

ground that it was an impermissible comment on the defendant's failure to testify. The trial court ruled that the statement was a fair comment on the evidence. Defense counsel argued during his closing arguments that the defendant could have placed his fingerprint on the tissue box before the murder, and pointed out that the box had been in a Pathmark store.[20] In his rebuttal argument, the prosecutor again stated that there was no evidence suggesting that the defendant had touched the tissue box anywhere except at the scene of the crime. He stated specifically that there was no evidence that the defendant ever had been in the store where the tissues had been sold. At the conclusion of the argument, the defendant renewed his objection to these statements. He also renewed his objection in his motion for a new trial, which the trial court denied.

The defendant argues that these statements by the prosecutor were improper "because the [s]tate's evidence by itself simply fails to prove that the fingerprint on the tissue box could only have been impressed during the crime and by these arguments the prosecutor intended to mislead the jurors into thinking that the alleged lack of an innocent explanation was affirmative evidence of something that the [s]tate had otherwise failed to prove." He further argues that the comments were misleading because there was evidence that the Buick in which the tissue box had been found had been used to transport insurance adjusters, like the defendant, and that the tissue box had been in a store before purchase, and this evidence could have raised a reasonable doubt as to whether the defendant could only have touched the tissue box at the crime scene.

---

[20] Joyce Hurley Brailsford, a friend of the victim's, testified that she and the victim had taken a trip to Florida in the Buick starting on June 29, 1973. Brailsford's mother had given them the box of tissues at that time. Brailsford believed that the tissues had been purchased at a Pathmark food store on Main Street in East Haven.

"It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution. *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. denied, 381 U.S. 957, 85 S. Ct. 1797, 14 L. Ed. 2d 730 (1965). . . . This court applies the following test in evaluating whether a prosecutor's remark has violated this right: Was the language used manifestly intended to be, or was it of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?" (Internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 358–59, 696 A.2d 944 (1997). "Repeated comments by the prosecutor on the failure of a defendant to 'tell' or to 'explain' certain events . . . have been held to be improper." *State* v. *Arline*, 223 Conn. 52, 67, 612 A.2d 755 (1992).

In the present case, we conclude that the jury would not necessarily have understood the prosecutor's statement that there was no evidence of an innocent explanation for the presence of the defendant's fingerprint on the tissue box or his DNA on the handkerchief as a comment on the defendant's failure to testify. Hanahan testified that the defendant had told him that he could not explain the presence of his fingerprint at the crime scene. It is a reasonable inference from the defendant's statement that he also would have been unable to explain the presence of his DNA on the handkerchief. Thus, the prosecutor was asking the jury to draw an inference from the defendant's statements, not from his refusal to testify.

Moreover, defense counsel argued during closing argument that the fingerprint could have been placed on the tissue box before the crime. The prosecutor was entitled to comment on the quality of the evidence supporting this claim. See *State* v. *Magnotti*, 198 Conn. 209, 220, 502 A.2d 404 (1985) (defendant, "by his failure

to testify, cannot insulate himself from general comment on the weakness of his case, even though his failure so to testify may be perceived by the jury as having contributed to the general weakness about which comment is made").

For the same reason, the defendant's claim that the prosecutor misled the jury by discounting possible innocent explanations for the fingerprint is also unavailing. The prosecutor acknowledged the evidence that the tissue box had been publicly available in the store where it had been purchased, and merely pointed out that there was no evidence that the defendant had ever been in the store. Thus, the prosecutor did not suggest that an innocent explanation was impossible, but only that it would be speculative. We conclude that, in light of defense counsel's argument that the defendant could have touched the tissue box before the crime, the comment was not improper. Accordingly, we reject this claim.

## B

The defendant next claims that the prosecutor improperly argued that the state had presented evidence of a motive for the murder when there was no such evidence. The following undisputed facts and procedural history are relevant to this claim. During his closing argument, the prosecutor initially stated that "one thing you [the jury] don't have any direct evidence of in this case is the motive for this crime." Defense counsel then argued during his closing argument that the absence of any evidence of motive gave rise to a reasonable doubt about the defendant's guilt. On rebuttal, the prosecutor stated: "You know the killer had a motive. You know that he got in [the victim's] Buick and he drove it from the scene of the crime and then he abandoned it. Did he abandon it because he was driving the wrong way and was going to have to go

back up another level or did he plan to abandon it on the eighth level? Was he taking the car from the ninth level because he wanted the car? There is not a clear answer to that question, but there is an inference that you could draw if you choose to, that that could be the motive." Defense counsel objected to the statement on the ground that there was no evidence that the perpetrator had intended to steal the car. The trial court overruled the objection on the ground that the fact that the perpetrator had driven the car gave rise to a reasonable inference that he had intended to steal it. The defendant renewed his objection in his motion for a new trial, which the trial court denied.

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Citations omitted.) *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002).

We conclude that, in the present case, the prosecutor's argument that the evidence could support an inference that the defendant had intended to steal the Buick verged on the speculative. Although, as a general matter, the fact that a person gets into another person's car and drives off with it could support an inference that the person intended to steal the car, there was no evidence in the present case that would explain why, if the defendant had murdered the victim in order to steal the Buick, he did not do so.[21]

---

[21] The state contends that the position of the Buick when it was found on level eight would support an inference that the perpetrator had made a wrong turn and was heading back up to level nine. Even if the jury could have inferred that the perpetrator had made a wrong turn—an inference that in itself was tenuous—the possibility that he made a wrong turn would not explain why he abandoned his plan to steal the Buick.

We need not decide whether the prosecutor's comment rose to the level of an impropriety, however, because, even if it was improper, we conclude that any impropriety was harmless and did not deprive the defendant of a fair trial. First, the prosecutor himself acknowledged to the jury that there was no direct evidence of motive, thereby reducing the impact of any impropriety. Second, the prosecutor did not suggest that there were facts not in evidence that would support a finding of motive, but relied entirely on the evidence that the defendant had driven the Buick in support of his argument. Thus, the weakness of the inference suggested by the prosecutor was readily discernible by the jury. Finally, the remark was isolated and was not central to the state's case. Accordingly, we reject this claim.

## C

The defendant next claims that the prosecutor improperly argued to the jury that, in order to have a reasonable doubt about whether the handkerchief in evidence was the item shown in photographs of the crime scene, they would have to disbelieve two state witnesses. The following undisputed facts and procedural history are relevant to this claim. Vincent Perricone, a detective with the New Haven police department in 1973, testified that he had investigated the crime scene on the day of the murder and had discovered the handkerchief on level seven of the garage. He placed his initials on the handkerchief at the time. He identified the handkerchief that was introduced as an exhibit at trial as the same handkerchief. Before Perricone touched the handkerchief at the crime scene, a police photographer had photographed it. Perricone testified that three photographs that were introduced as exhibits at trial showed the handkerchief as it had been found.

Robert Fonteyn, another detective with the New Haven police department in 1973, testified that he also had investigated the crime scene. He also had marked his initials on the handkerchief that was found at the crime scene and identified the handkerchief that was admitted as an exhibit at trial as the same one. He testified that he had taken the photographs of the handkerchief at the crime scene, which later were admitted as exhibits at trial.

During his closing argument, defense counsel argued that the item depicted in the photographs appeared to be much larger and bulkier than the handkerchief that had been admitted as an exhibit. He argued that, instead of a handkerchief, the item appeared to be a shirt or a towel. He further argued that the item in the photographs did not appear to have any stains on it. In rebuttal, the state argued that, in order to believe that the item in the photographs was not the handkerchief, the jury would "have to choose to disbelieve both . . . Fonteyn and . . . Perricone. And to do that, you've got to think of something in their testimony that would support disbelieving them. And you didn't hear anything like that. And you didn't see anything that would indicate that they were so out of it [that] they would be incorrect at that level."

The defendant objected to the statements on the ground that they violated the principle that closing arguments suggesting that, "in order to find the defendant not guilty, the jury must find that witnesses had lied, are . . . improper." *State* v. *Singh*, supra, 259 Conn. 712. The trial court overruled the objection. The defendant renewed his claim in his motion for a new trial, which was denied.

"[C]ourts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied. . . .

The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof." (Citations omitted; internal quotation marks omitted.) Id., 709.

In the present case, the state contends that the prosecutor did not violate these principles when he suggested that, in order to accept the defendant's argument, the jury would have to disbelieve Fonteyn and Perricone, because he was merely summarizing defense counsel's argument that the testimony of these witnesses was not supported by the photographic evidence. See *State* v. *Santiago*, 269 Conn. 726, 743–44, 850 A.2d 199 (2004) (no *Singh* violation when prosecutor merely summarized defendant's argument that state witnesses must have lied); see also *State* v. *Burton*, 258 Conn. 153, 166–70, 778 A.2d 955 (2001) (state properly may argue that state witnesses had no apparent motive to lie).

We agree with the state. Although it would have been preferable if the prosecutor had not used the "choose to disbelieve" language in rebutting defense counsel's argument that the photographic evidence did not appear to be consistent with the testimony of the police witnesses, the prosecutor was merely pointing out a necessary inference from defense counsel's argument. If defense counsel was correct that the item in the photograph *was not* the handkerchief, then the testimony that the item *was* the handkerchief necessarily was inaccurate.

Moreover, the prosecutor did not argue that the jury would be *required* to conclude that the witnesses had *lied* under oath in order to accept defense counsel's argument. Rather, by stating that the jury "didn't see anything that would indicate that [the witnesses] were so out of it [that] they would be incorrect at that level," the prosecutor implicitly acknowledged that the jury could discount the testimony if they found evidence

that the witnesses might have been confused or mistaken. Cf. *State* v. *Tate*, 85 Conn. App. 365, 369, 857 A.2d 394 (prosecutor improperly argued to jury that, to believe defense raised by defendant, jury *necessarily* would have to conclude that police witnesses were *lying* and had engaged in " 'some grand conspiracy' "), cert. denied, 272 Conn. 901, 863 A.2d 696 (2004). Accordingly, we conclude that these statements by the prosecutor were not improper.

## D

Finally, the defendant claims that the prosecutor improperly expressed his personal opinion concerning the ultimate issue in the case, the identity of the perpetrator.[22] The following undisputed facts are relevant to our resolution of this claim. Shortly after the murder, Petzold and Woodstock, who had been eyewitnesses to the events immediately preceding and following the murder, met separately with a police sketch artist who prepared two composite drawings based on their descriptions. The drawings were introduced into evidence at trial. A photograph of the defendant taken in 1973 also was introduced into evidence. During closing argument, the prosecutor stated, "And who looked stunningly like the drawings . . . done in 1973 by the only two people who got a clear view of this killer? [The defendant.]" During rebuttal argument, the prosecutor compared the drawings with the photograph and pointed out various similarities and differences between them.[23]

---

[22] The defendant did not raise this claim at trial and, therefore, his claim is unpreserved. We previously have recognized that a claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, supra, 204 Conn. 540. See *State* v. *Stevenson*, 269 Conn. 563, 573–75, 849 A.2d 626 (2004).

[23] The prosecutor stated: "You could find things that match, you could find things that don't match.

"Well, you could find things that match and that are not normal, that are not in everybody's face. Right here, the lips, very high peaks in [the defen-

"The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 713.

The defendant in the present case also relies on this court's decision in *State* v. *Finan*, 275 Conn. 60, 68–69, 881 A.2d 187 (2005), in which this court held that lay opinion testimony by police officers that the person depicted in a surveillance videotape of a robbery was the defendant constituted impermissible testimony as to the ultimate issue in the case, namely, the identity of the perpetrator.

dant's] lips, would you say? Look at them right here. Flat cheekbone, here, almost perfectly here. If you look over here, that's almost exact, this hair is almost exact. And you remember he looked directly at . . . Woodstock. . . . Petzold didn't look at him, at least, and he gives you a side view, this is also consistent with what both of them said. The hair is different here, but is that attributable to this hair being blown back because he is moving or because it's windy in that garage . . . . You don't have to seek out things that are the same, they leap out at you. The eyebrow here is not as prominent here, but it's definitely peaked. They weren't taking a picture, they were working from memory.

"And, remember, this isn't an identification until you make it because neither one of those people was asked to look at [the defendant] in the courtroom and say that's him. They weren't asked those questions at all. They weren't asked to compare that photograph to the picture because that would be an opinion. You're allowed to draw that opinion, but they aren't. And this is not insignificant.

"Is it a perfect portrait? Naturally, not. But you've got to look at it with all of the evidence together."

We conclude that the prosecutor's remarks were not improper. The prosecutor did not state that the person depicted in the composite drawings *was* the defendant, but merely pointed out that the drawings were similar in some respects to the defendant's photograph. Cf. id., 69 ("lay witnesses may testify regarding . . . similarity of persons"). He also acknowledged that there were differences. Although any determination of similarity is, to some extent, a matter of opinion, the prosecutor's statements were a fair inference from the evidence. Moreover, the prosecutor did not suggest that he had information that was unavailable to the jury that would support a finding that the appearances were similar, but made it clear that such a finding could be made—or rejected—only by the jury and only by comparing the photograph with the drawings.

Finally, unlike in *Finan,* where the jury could not have concluded that the person depicted in the video-tape of the robbery was the defendant without also finding the defendant had committed the robbery, the jury in the present case could have concluded that the photograph of the defendant had similarities to the drawings without also finding that the defendant was guilty. Thus, the prosecutor's remarks did not go to the ultimate issue in the case. Accordingly, we reject this claim.

The judgment is affirmed and the case is remanded to the trial court with direction to correct the clerical errors in the information and judgment file.[24]

In this opinion the other justices concurred.

---

[24] See footnote 1 of this opinion.