STATE OF CONNECTICUT *v.* RONALD C. MOODY
(13726)

PETERS, C. J., SHEA, GLASS, COVELLO and HULL, Js.

Argued March 7—decision released April 24, 1990

*David E. O'Connor,* special public defender, for the appellant (defendant).

*James A. Killen,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *David Gold,* assistant state's attorney, for the appellee (state).

GLASS, J. The defendant in this case, Ronald C. Moody, was arrested on March 13, 1987, and charged with the murder of Andrew Long, in violation of General Statutes § 53a-54a.[1] Pursuant to General Statutes § 54-46a,[2] a probable cause hearing was held before

---

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

[2] "[General Statutes (Rev. to 1987)] Sec. 54-46a. PROBABLE CAUSE HEARING FOR PERSONS CHARGED WITH CRIMES PUNISHABLE BY DEATH OR LIFE IMPRISONMENT. (a) No person charged by the state on or after May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there

Judge William L. Hadden on May 5, 6 and 7, 1987. At the conclusion of this hearing, Judge Hadden ruled that the state had not established probable cause for the murder charge. The state then requested that another probable cause hearing be scheduled so that it could present further evidence to support the murder charge.

On May 14, 1987, a second probable cause hearing commenced before Judge Barry R. Schaller, during which the state again sought to present evidence establishing probable cause for the murder charge. Judge Schaller, however, ruled that the state, once again, had failed to establish probable cause for the murder

is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause.

"(b) Unless waived by the accused person or extended by the court for good cause shown, such preliminary hearing shall be conducted within sixty days of the filing of the complaint or information in superior court. The court shall be confined to the rules of evidence, except that written reports of expert witnesses shall be admissible in evidence and matters involving chain of custody shall be exempt from such rules. No motion to suppress or for discovery shall be allowed in connection with such hearing. The accused person shall have the right to counsel and may attend and, either individually or by counsel, participate in such hearing, present argument to the court, cross-examine witnesses against him and obtain a transcript of the proceedings at his own expense. At the close of the prosecution's case, if the court finds that, based on the evidence presented by the prosecution, probable cause exists, the accused person may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered. The court shall not allow the accused person to present such evidence unless the court determines that such evidence would be sufficient to rebut the finding of probable cause.

"(c) If, from the evidence presented pursuant to subsection (b) of this section, it appears to the court that there is probable cause to believe that the accused person has committed the offense charged, the court shall so find and approve the continuance of the accused person's prosecution for that offense. A determination by the court that there is not probable cause to require the accused person to be put to trial for the offense charged shall not operate to prevent a subsequent prosecution of such accused person for the same offense."

charge. The state then requested that the murder charge be "dismissed without prejudice." In response to the state's request, Judge Schaller dismissed the murder charge without prejudice. On September 3, 1987, a third probable cause hearing was held, once again, before Judge Hadden. This time, Judge Hadden found probable cause to support the murder charge. The defendant was tried to a jury of twelve, which, on October 13, 1988, found him guilty of murder. Judge Hadden then sentenced the defendant to forty-five years imprisonment.

On appeal, the defendant claims: (1) that the trial court erred in denying his motion for judgment of acquittal because of insufficient evidence to support the verdict; (2) that the trial court erred in denying his motion to exclude certain evidence, thus permitting the state to present irrelevant and prejudicial evidence; (3) that it was error for a subsequent probable cause hearing to be held before a different judge and absent significant new evidence; and (4) that the court's dismissal of the information without prejudice at the second probable cause hearing was erroneous. We find error only in the trial court's failure to grant the defendant's motion in limine.

The jury could reasonably have found the following facts. On the afternoon of Saturday, February 28, 1987, Malcolm Thomas visited the victim, Andrew Long, at Long's apartment in New Haven. Thomas had a drink, and they both watched videotapes. Later, they drove downtown to Macy's to purchase another VCR so that they could make copies of the videotapes. At the mall, Thomas and Long ran into the defendant, and Long invited the defendant to drop by his apartment later in the day. Thomas and Long then returned to Long's apartment after stopping to buy two one liter bottles of ginger ale. Upon arriving at Long's apartment, they

carried in the new VCR, the ginger ale and two one-half gallon sized bottles of vodka that had been in Long's car. In the apartment, Thomas and Long opened one of the new bottles of vodka and made drinks, and Thomas began connecting the new VCR with the old one. A short time later, the defendant arrived and stayed for fifteen to twenty minutes. He spoke with Long while Thomas continued attempting to connect the two VCRs. Thomas did not see the defendant have a drink at that time. The defendant then left the apartment saying he would be right back, but he did not return during the one or two hours that Thomas remained at the apartment.

At approximately 11:30 the next morning, Sunday, March 1, three young men passed by Long's apartment on their way to play basketball. One of these men, Anthony Johnson, knew the defendant from their previous attendance together at the Westover job corps. Another man, Robert Williams, knew Long personally. Williams testified that he saw Long and another man, whom he later identified as the defendant, arguing in front of Long's apartment. Johnson testified that he did not know Long, but recognized the defendant and said, "How are you doing Moody," and Moody said "Hi" in return. At one point during the argument, Williams heard Long say, "I'm sick of your shit," and then Long turned to go into his apartment and the defendant grabbed his arm. Long pulled his arm away and went into his apartment, followed by the defendant.

At approximately 2 o'clock that afternoon, Long drove over to Earl Osborne's house and brought him back to his apartment. While at the apartment, the two men drank vodka and ginger ale and watched a basketball game. At one point, Leslie Williams, a friend of Long, stopped by and said she had car trouble and asked for assistance. While Leslie Williams was in the

apartment, Osborne went to the refrigerator to make another drink, but Long asked him not to do so because there was only "about an inch" of vodka left. Long and Osborne then went out and helped Leslie Williams get her car started. The two men then went and purchased some Kentucky Fried Chicken, and returned to Long's apartment at about 4 p.m. Upon returning to the apartment, Long and Osborne had another drink, and Long played a videotape. Long and Osborne then changed into shorts and proceeded to engage in oral sex while watching the videotape. Thereafter, Long said "he had company coming over," so he had to take Osborne home. Before they left, however, they cleaned up the apartment, "including the glasses." Osborne returned home at approximately 7 p.m. on Sunday, and Long was seen returning to his apartment, with a bag in his hands, at about 7:30 p.m. on Sunday.

That same night, at about 11:30 p.m., Long was beaten to death in his apartment with a blunt instrument. The evidence indicated that Long had been lying back on a couch, naked except for an open shirt, when he was beaten on the head and chest. The state's criminologist testified that, after Long was killed, his arm was moved so that his hand pointed to his penis. Furthermore, there was blood spattered in all directions, covering the walls, curtains and windows. The television set was on, with the screen showing static. Connected to the set were two VCRs, both in the "on" position and both containing videotapes that had been stopped midway.

On the floor next to Long's body was a drinking glass. A subsequent fingerprint examination revealed two sets of latent fingerprints on the glass, one belonging to Long and one belonging to the defendant. It was also determined that the defendant's fingerprints had been superimposed over Long's. In the kitchen sink, the

detectives discovered a drinking glass containing a "reddish-brown" substance. This substance was later determined to be approximately three "driplets" of blood consistent with Long's blood type, and the fingerprints on the glass matched those of the defendant. A third glass on the kitchen counter also contained the fingerprints of both the defendant and Long. In addition, the defendant's fingerprints were lifted from the refrigerator door. In the refrigerator were a bottle of vodka and a bottle of ginger ale, both of which were almost full. The latent fingerprints lifted from the ginger ale bottle matched both the fingerprints of Long and the defendant. Those removed from the vodka bottle matched only those of the defendant. The detectives also discovered a bloodied tissue on the kitchen counter near the sink. The defendant is black, and a test of the blood on the tissue showed that it was consistent with the blood type of the defendant, as well as approximately 3 percent of the black population.

On the afternoon of March 5, the police asked the defendant if he would go to the police station to be interviewed, and he agreed. The defendant declined to be tape-recorded or to sign a statement, but he voluntarily stayed there for four hours answering every question that he was asked. In particular, the defendant stated that he had met Long a few years earlier when Long was his caseworker at the welfare office. Initially, the defendant denied that he had ever engaged in sexual relations with Long. Subsequently, he admitted that he and Long had had sexual relations approximately twelve times and that he felt guilty about it. The defendant stated further that he had been at Long's apartment on Saturday, February 28, and had prepared "several drinks" of vodka and ginger ale for himself. He told the police that he had used only two glasses while he was there, a taller glass for the ginger ale and a shorter glass for the vodka, and that he had consumed

the drinks in the living room. He also told the police that, during the thirty to sixty minutes that he was there, he had gone into every room in Long's apartment. The defendant, however, denied having seen the victim again after approximately 4:30 to 5 p.m. on Saturday, February 28.

With respect to his activities on Sunday, March 1, the defendant told the police that he did not leave his apartment, which he shared with his friend Brian Wells, until approximately 7 or 8 p.m. At that time, he stated that he went across the street to a convenience store to buy cigarettes, and then walked around, eventually stopping at the corner of Kensington and Edgewood Streets to purchase some marihuana. He told police that from there he went to see a friend at a house on County Street, and then returned to his apartment either at 10 p.m., 11 p.m. or midnight that evening. Wells testified, however, that the defendant left their apartment twice on Sunday, March 1. The first time was at approximately 10 or 10:30 a.m., and the second was sometime in the early evening. When the defendant returned the second time, shortly after midnight, Wells noticed a cut on the defendant's wrist that was just beginning to clot. Wells gave the defendant a tissue to help stop the bleeding, but did not notice any other blood spatters on him. Wells further testified that the defendant appeared upset and nervous. In addition, sometime after the defendant was interviewed by the police on March 5, he telephoned Wells and asked him whether he had spoken with the police, and asked him not to sign anything. Moreover, the police seized a number of articles of clothing from the defendant's apartment, including a pair of black shoes that he had worn for at least two weeks prior to their seizure. A stain on the sole of one of the shoes passed the "presumptive test for blood," but was too small for further testing.

The defendant testified at trial, and once again stated that he was at Long's apartment on Saturday afternoon, February 28. Contrary to Thomas' testimony, however, the defendant testified that he made himself two drinks at that time, and used only two glasses while he was there. The defendant reiterated on the stand that he did not see Long again after Saturday afternoon, and stated that he had cut his wrist while jogging on Saturday after leaving Long's apartment. He admitted that he left his own apartment earlier on Sunday, as Wells stated, but claimed it was early afternoon and not late morning when he left.

## I

The defendant first argues that, because of insufficient evidence to support the verdict, the trial court erred in denying his motion for a judgment of acquittal. We disagree.

"When a verdict is challenged because of insufficient evidence, the issue is whether ' " 'the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt.' " ' *State* v. *Braxton,* 196 Conn. 685, 691, 495 A.2d 273 (1985), quoting *State* v. *Stepney,* 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). Appellate analysis of a claim of insufficiency of the evidence requires us to undertake a twofold task: We must first review the evidence construing it in the light most favorable to sustaining the trial court's verdict. *State* v. *Williams,* 205 Conn. 456, 468, 534 A.2d 230 (1987); *State* v. *Vincent,* 194 Conn. 198, 206, 479 A.2d 237 (1984); *State* v. *D'Antuono,* 186 Conn. 414, 421, 441 A.2d 846 (1982); *State* v. *Perez,* 182 Conn. 603, 606, 438 A.2d 1149 (1981). ' " 'We then

determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct.' " ' *State* v. *Plourde,* 208 Conn. 455, 458, 545 A.2d 1071 (1988), quoting *State* v. *Rollinson,* 203 Conn. 641, 665–66, 526 A.2d 1283 (1987), and cases cited therein." *State* v. *Avis,* 209 Conn. 290, 308–309, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989).

Although the evidence in this case is far from overwhelming, it was sufficient to support the jury's finding. As noted above, the defendant's fingerprints were found in Long's apartment. Given that the defendant was in Long's apartment on the day before the murder, this fact alone is not significant. The placement of the fingerprints, however, could reasonably have led the jury to believe that the defendant was in Long's apartment on the night of his murder. In particular, Osborne testified that when he was at Long's apartment until about 7 p.m. on Sunday, there was only "about an inch" of vodka in the bottle in the refrigerator. When Long's body was discovered, however, the defendant's fingerprints were found on a full bottle of vodka in Long's refrigerator. Thus, the jury could have inferred from this fact, and the fact that the defendant's fingerprints were the only ones found on the glass in the sink that contained driplets of blood consistent with Long's blood type, that the defendant had been in Long's apartment after Osborne had been there on the evening of Long's murder.

Moreover, the jury could reasonably have inferred from the presence on Long's kitchen counter of the tis-

sue with blood on it consistent with the defendant's blood type, that the defendant had wiped his bleeding cut while at Long's apartment on the night of the murder in much the same fashion as he did when he arrived back at his own apartment that night. Furthermore, it was reasonable for the jury to conclude that the defendant had not left the tissue at Long's apartment when he was there on the day before the murder, because the defendant testified that he had cut himself while jogging after he had left Long's apartment on Saturday afternoon.

Additionally, the state of mind that is characterized as "guilty consciousness" or "consciousness of guilt" is strong evidence that a defendant is indeed guilty. *State* v. *Burak,* 201 Conn. 517, 533, 518 A.2d 639 (1986). "We have held that misstatements of an accused, which a jury could reasonably conclude were made in an attempt to avoid detection of a crime or responsibility for a crime or were influenced by the commission of the criminal act, are admissible as evidence reflecting a consciousness of guilt." (Emphasis omitted.) *State* v. *Milner,* 206 Conn. 512, 519, 539 A.2d 80 (1988). In this vein, the jury could reasonably have concluded that the following misstatements by the defendant were indicative of a consciousness of guilt. First, the defendant's testimony that he never saw Long again after Saturday afternoon was directly contradicted by the testimony of both Robert Williams and Anthony Johnson, and the jury was free to find Williams and Johnson the more credible witnesses. Second, in his initial statement to the police the defendant maintained that he had not left his apartment on Sunday until early evening. At trial, the defendant stated that he had left his apartment sometime Sunday afternoon. Both of these assertions were contradicted by the testimony of Williams, Johnson and

Brian Wells. Again, the jury could reasonably have concluded that Williams, Johnson and Wells were the more credible witnesses. Also, the jury could reasonably have inferred a consciousness of guilt from the defendant's instructing Wells not to sign a statement with the police.

In sum, although the evidence in this case is not overwhelming, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt. Thus, the trial court did not err in concluding that there was enough evidence for this case to go to the jury.

## II

Next, the defendant argues that the trial court erred in denying his motion in limine, thus permitting the state to present irrelevant and prejudicial evidence. We agree. In particular, the police seized clothing and a pair of black shoes from the defendant's apartment. The items were tested for the presence of blood, and none was found on the clothing. A stain on one of the soles of the defendant's shoes, however, gave a positive result for the "presumptive test for blood." At trial, the state's serologist, Elaine Pagliaro, testified that the "presumptive test for blood" is only a preliminary screening test that determines whether the actual test for blood should be administered.[3] She further testi-

---

[3] At trial, the following colloquy transpired between the state's attorney and Pagliaro:

"Q. Now, when a stain is presented to your office for comparison purposes would you explain for the ladies and gentlemen of the jury the first type of test that you do on a stain to determine whether or not it is blood?

"A. The first test which is performed on a stain which is a suspected blood stain is a chemical presumptive test or a screening test and this is a color test and if the result is positive that indicates the sample may be blood or may be some other substance causing the color change.

"Q. And so all that does, would it be fair to say, is give you a springboard to determine whether or not further testing should be done?

"A. That's correct."

fied that the positive result on "the presumptive test" meant that the stain could be human blood, animal blood or something other than blood. In this case, however, the stain was too small to have the actual test for blood administered to it. Prior to Pagliaro's testimony, the defendant filed a motion in limine arguing that the result of the "presumptive test for blood" should not be admitted because: "(1) said testimony is of no probative value whatsoever; and (2) it would have the effect of prejudicing the jury." The trial court, however, denied the motion and an exception was duly noted.

"The first test of the admissibility of any evidence is whether it is relevant." *State* v. *Ward,* 172 Conn. 163, 167, 374 A.2d 168 (1976). "We have reiterated that evidence is relevant only when it tends to establish the existence of a material fact or to corroborate other direct evidence in the case. *State* v. *Sharpe,* 195 Conn. 651, 659, 491 A.2d 345 (1985); *State* v. *Mastropetre,* 175 Conn. 512, 517, 400 A.2d 276 (1978)." *State* v. *Talton,* 197 Conn. 280, 285, 497 A.2d 35 (1985). "We have noted that ' "Evidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable . . . . " ' " *State* v. *Gold,* 180 Conn. 619, 645–46, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). In the present case, the result of the "presumptive test for blood" had no probative value whatsoever. The test result did nothing toward establishing the likelihood of the presence of human blood on the sole of the defendant's shoe. Therefore, we hold that the test result was entirely irrelevant, and thus, the trial court abused its discretion by admitting it into evidence.

Having found error, we must now determine whether this error was harmful. The error in this case does not involve a constitutional violation. " ' "When a trial error in a criminal case does not involve a constitutional violation the burden is on the defendant to demonstrate the harmfulness of the court's error. *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980). The defendant must show that it is more probable than not that the erroneous action of the court affected the result. Id.; *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976)." *State* v. *Jones,* 205 Conn. 723, 732, 535 A.2d 808 (1988).' *State* v. *Vilalastra,* 207 Conn. 35, 47, 540 A.2d 42 (1988)." *State* v. *Sierra,* 213 Conn. 422, 436–37, 568 A.2d 448 (1990).

We conclude that the defendant has met his burden in this case. Specifically, we conclude that it is more probable than not that the erroneous action of the court misled the jury and thereby affected the result of the defendant's trial. In particular, the jurors sent out a note during deliberations that informed the court that they desired to rehear the testimony regarding: "[W]hat shoe blood found on." In *State* v. *Hoeplinger,* 206 Conn. 278, 298, 537 A.2d 1010 (1988), we noted that a jury's request that testimony be reread indicated that the jury regarded the evidence as important. See *Fiswick* v. *United States,* 329 U.S. 211, 220, 67 S. Ct. 224, 91 L. Ed. 196 (1946). Thus, not only is the jurors' question a clear indication that they deemed the evidence regarding the "presumptive test for blood" as being important, but the jurors' question also undeniably indicates that they were misled. Given that the jurors' note read, "[W]hat shoe blood found on," it is obvious that they did not understand that only a stain was found on the defendant's shoe, and that the "presumptive test for blood" was not probative that the stain on the shoe was human blood.

As a result, we find that the trial court's failure to grant the defendant's motion in limine constituted harmful error.

## III

The defendant also argues that his third probable cause hearing was defective as it was not before the same judge as his second probable cause hearing, and was devoid of any significant new evidence. We disagree.

The defendant acknowledges that General Statutes § 54-46a (c) specifically states in part: "A determination by the court that there is not probable cause to require the accused person to be put to trial for the offense charged shall not operate to prevent a subsequent prosecution of such accused person for the same offense." Nevertheless, he contends that considerations of due process mandate that subsequent probable cause hearings be held before the same judge and only when new evidence is to be presented. We need not address the defendant's arguments, however, because, even if we agreed with his assertions, the defendant's probable cause hearing would still have been free from error. In particular, the defendant's third probable cause hearing was presided over by the same judge who presided over his first hearing, and significant new evidence was presented by the state at the third hearing. Specifically, the state introduced, for the first time, the testimony of Robert Williams, who stated that he saw the defendant arguing with Long on the day of the murder. Thus, the defendant's claims of error regarding his third probable cause hearing are without merit.

## IV

Finally, the defendant asserts that the court's dismissal of the information without prejudice at the second probable cause hearing was error. We disagree.

After the court's finding of no probable cause at the second probable cause hearing, the state requested that the murder charge be "dismissed without prejudice." Specifically, the state argued: "It is the State's intention, your Honor, to continue this investigation and we believe we presented evidence indicating [the defendant's] involvement in this murder. Your Honor has found it to be lacking, but the State still feels it wishes to continue an investigation in an effort to build a stronger case to present to the Court. And, therefore, I don't want any misinterpretation of the State's actions or comments to indicate anything other than a resolute intention to pursue this matter on the charge of murder. And I believe that under Section 54-46a, which is the operative statute, that it provides for the ability of the State to reprosecute on murder after a contrary ruling by the Court." The court then asked defense counsel if he had "any objection or any comments about the procedure the State wishe[d] to follow." Defense counsel responded: "I have no objections to it, your Honor. I would also ask that the Court dismiss the charge." The court then ruled: "[T]he Court will enter a dismissal without prejudice to the State to reinstitute a prosecution as I think is provided for by the operative statute [§] 54-46a. So the charge of murder against [the defendant] is dismissed without prejudice to the State to renew the proceeding, renew the prosecution at a later time."

The defendant now argues that General Statutes § 54-56b,[4] as interpreted in *State* v. *Talton,* 209 Conn.

---

[4] "[General Statutes] Sec. 54-56b. RIGHT TO DISMISSAL OR TRIAL ON NOLLE. A nolle prosequi may not be entered as to any count in a complaint or information if the accused objects to the nolle prosequi and demands either a trial or dismissal, except with respect to prosecutions in which a nolle prosequi is entered upon a representation to the court by the prosecuting official that a material witness has died, disappeared or become disabled or that material evidence has disappeared or has been destroyed and that a further investigation is therefore necessary."

133, 547 A.2d 543 (1988), mandates that the court's dismissal of the murder charge against the defendant should have been with prejudice. We find no merit, however, to the defendant's argument. In particular, § 54-56b concerns the state's right to seek a nolle prosequi when the defendant "demands" a dismissal. See id., 139–40. In the present case, the state was not attempting to enter a nolle prosequi, but rather, was simply requesting that the court dismiss the murder charge without prejudice so that it would be free to renew the prosecution at a later time as provided for by § 54-46a. Furthermore, defense counsel acquiesced in this arrangement.

There is error, the judgment is set aside and the case is remanded for a new trial.

In this opinion the other justices concurred.

