******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

STATE OF CONNECTICUT *v.* LASHAWN R. CECIL
(AC 42097)

Keller, Bright and Bear, Js.

*Syllabus*

Convicted of the crimes of murder and criminal possession of a firearm, the defendant appealed. The defendant's conviction stemmed from an incident in which he entered an apartment building and shot the victim. Shortly thereafter, the defendant encountered his neighbor, L, who bought a gun from the defendant. After learning of the victim's murder, L broke the gun into pieces and threw it into a river, but subsequently informed the police of what he had done. The trial court denied the defendant's motion in limine to preclude the state from introducing into evidence a handgun magazine recovered during an underwater search of the river. At trial, the state presented written and video recorded statements that two witnesses, C and D, had made to police inculpating the defendant in the victim's murder. C and D testified that their statements were false and the result of police coercion. *Held:*

1. The defendant's claim that the trial court erroneously admitted the video recorded statements into evidence under *State* v. *Whelan* (200 Conn. 743) was not reviewable, the defendant having failed to brief the claim adequately; although the defendant labeled his claim in his brief as evidentiary in nature, he predominantly analyzed it as instructional in nature, as he did not challenge the admissibility of the statements under *Whelan*, and his only contention was an undeveloped claim of instructional error, namely, that the court had the obligation to instruct the jury as to which portions of the video recorded statements could be used for impeachment purposes and which portions could be used substantively, the defendant's brief did not comply with the applicable rule of practice (§ 67-4 [e] [3]) concerning claimed evidentiary errors, and it was not the proper role for this court to guess at the nature of the defendant's claim and the legal analysis to apply thereto.

2. The defendant could not prevail on his claim that the trial court erroneously admitted into evidence the handgun magazine, which he claimed was irrelevant, prejudicial and misleading: the recovered magazine tended to show that the defendant had access to a firearm shortly after the victim's murder, supported the conclusion that the magazine belonged to the firearm used to kill the victim, and corroborated the state's theory of the case, as it corroborated L's testimony that the defendant sold him a handgun on the morning of the victim's murder and that he had thrown the disassembled handgun into the river, and the handgun magazine was relevant because a firearms examiner testified that the recovered magazine was consistent with a magazine that would fit the type of handgun used to kill the victim; moreover, even though the defendant claimed that the magazine was not reliable evidence because it had physically degraded, the state presented evidence that the condition of the magazine at the time it was recovered from the river was different from its condition at the time the crime was committed, but that the change was due to natural causes, not human activity, and it was relevant and probative because it aided the trier of fact in determining a material fact or in corroborating other direct evidence in the case.

Argued September 11—officially released November 19, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of murder and criminal possession of a firearm, brought to the Superior Court in the judicial district of New London, where the first count was tried to the jury before *Jongbloed, J.*, and the second count was tried to the court, *Jongbloed, J.*; verdict of guilty of murder; judgment of guilty of murder and criminal

possession of a firearm, from which the defendant appealed. *Affirmed.*

*Christopher Y. Duby*, assigned counsel, with whom was *Robert L. O'Brien*, assigned counsel, for the appellant (defendant).

*Nancy L. Walker*, assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Stephen M. Carney*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Lashawn R. Cecil, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a) and the judgment of conviction, rendered following a trial to the court, of criminal possession of a firearm in violation of General Statutes § 53a-217. On appeal, the defendant claims that the trial court erroneously (1) admitted video recorded statements into evidence under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and, simultaneously, admitted those same statements as impeachment evidence without instructing the jury how to evaluate that evidence, and (2) admitted into evidence a handgun magazine that was irrelevant, highly prejudicial, and misleading. We affirm the judgment of the trial court.

From the evidence adduced at trial, the jury reasonably could have found the following facts. At the time of the events underlying this appeal, the victim, Jaclyn Wirth, resided at the Mohegan Apartments located in Norwich. On the evening of December 13, 2011, the defendant was at the Mai Thai bar in Norwich with William Collelo and Harold Butler. Also present at the bar was an individual named Ezekial "Junie" Boyce. Boyce owed Butler a debt of approximately $160 for a prior sale of narcotics. The defendant, Collelo, and Butler left the bar at approximately 1 a.m. on December 14, 2011. The three men left in Collelo's rental car, a black Chrysler 300 with Florida license plates.

After leaving the bar, Collelo drove the three men to the Mohegan Apartments because Collelo had informed Butler that Boyce often spent time at the apartments, and Butler wanted to collect the money owed to him by Boyce. Collelo parked his vehicle outside the Mohegan Apartments, and Butler told the defendant to go see Boyce to collect the money that he owed Butler. The defendant exited the vehicle and approached the Mohegan Apartments.

At approximately 1:30 a.m., the defendant entered the building of the apartment complex in which the victim resided. Seconds after the defendant entered the building, a neighbor, Arthur Murray, heard a gunshot, a woman scream, and then four or five more gunshots.

Subsequently, the victim placed a 911 call, reporting that she had been shot. Norwich police received a call from dispatch at approximately 1:40 a.m. and responded to the scene. En route to the scene, responding Police Officer Mark Dean observed a dark colored Chrysler 300 with Florida license plates parked in a driveway on Boswell Avenue. At the scene, officers found the victim bleeding while lying on the floor of the main hallway of her apartment. The victim told a responding officer that, prior to the shooting, she had been lying

in bed, heard a loud bang, and left her bed to investigate. She further said that when she entered the hallway from her bedroom, she "kept getting hit." An ambulance transported the victim to Backus Hospital where she was pronounced dead at 2:50 a.m. on December 14, 2011, as a result of multiple gunshot wounds.

Immediately following the shooting, the defendant, out of breath from running, returned to Collelo's vehicle. The defendant told Collelo and Butler that he "handled it" and they should leave. Collelo drove the three men from the scene, and on Boswell Avenue they saw a police cruiser approaching from the opposite direction with its lights on. At the defendant's direction, Collelo parked the vehicle in a driveway as the police cruiser passed. While the vehicle was parked in the driveway, the defendant "said something about shooting a gun" and told Butler that "something went wrong . . . ." Collelo then drove the vehicle to the defendant's residence on Shetucket Avenue. Butler walked to his residence and Collelo and the defendant entered the defendant's residence. The defendant went upstairs with Evette Nieves, with whom he shared the residence. The defendant and Nieves then left the residence at approximately 2 a.m. and Collelo slept on the couch.

During an investigation of the scene, law enforcement found nine bullet holes in the victim's apartment door and six corresponding defects caused by bullets in the victim's apartment. Investigators also found nine spent shell casings, one live shell, and five brass colored projectiles. Gregory Klees, a firearms and tool mark examiner from the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives Laboratory (ATF), testified that the same firearm had fired all recovered ballistics evidence and that the firearm was likely a Beretta nine millimeter semiautomatic pistol.

Following the victim's murder, at approximately 2 a.m. on December 14, 2011, Luis Burgos, the defendant's neighbor, was sitting in front of his house when the defendant approached him, asked whether he was interested in purchasing a firearm, and sold him a nine millimeter firearm. Later that morning, Burgos learned that the victim had been shot and killed. Burgos, who was on parole, feared that his residence would be searched and the possession of the firearm would place him in violation of his parole. Burgos drove to a fishing area on the Thames River, dismantled and unloaded the firearm, and threw the pin, magazine, slider, and bullets into the river.

Burgos later was convicted and sentenced for an unrelated armed robbery committed on March 30, 2013. Hoping to reduce his own sentence and eliminate any personal affiliation with the victim's murder, Burgos contacted law enforcement in 2014 and shared the information he knew about the victim's murder. After he provided the information to police, law enforcement

transported Burgos to the area near the Thames River where he claimed to have disposed of the firearm pieces. The Connecticut state police dive team performed a five day search of the Thames River and recovered a handgun magazine. The dive team found the magazine in approximately ten feet of water and approximately sixty-four feet from railroad tracks that ran alongside the shore. At trial, when asked about any markings on the gun the defendant had sold him, Burgos responded, "I think it said Llama; I think that's what it said."

Klees examined the magazine, which was heavily corroded due to water exposure, and determined that it was either an aftermarket or a replacement magazine that, prior to being submerged in the Thames River, likely could have fit a nine millimeter Beretta handgun. Klees also concluded that the magazine would not have likely fit a Llama handgun.

Following the victim's murder, the defendant disclosed his involvement in the shooting to multiple parties. Prior to the shooting, on December 13, 2011, the defendant asked Jeremy Dawson if he wanted to participate in a robbery of Boyce. Dawson declined, and on the day after the shooting had occurred, the defendant told Dawson that he had gone to the Mohegan Apartments to find Boyce. Further, the defendant told Dawson that he had knocked on a door and a female asked who was there. When the defendant could not enter the apartment, he shot through the door. When Dawson later learned of the victim's death, he thought that the victim was the female to whom the defendant earlier had referred.

The defendant also made a reference to the victim's murder to his former girlfriend, Samantha Whitcher. In Whitcher's words, during an argument, the defendant told her that if she ever left him "he'd kill [her] like he supposedly killed the girl in Norwich." After the defendant and Whitcher ended their relationship, the defendant also told Whitcher that he kept a firearm at Nieves' residence.

In 2015, the defendant was in a prison transport van when a prisoner, Jesse Kamienski, overheard the defendant telling another prisoner "about how he was arguing with a woman to get into a door, and he couldn't get in so he fired shots through the door." The prisoner to whom the defendant was speaking refused to confirm Kamienski's account, instead stating, "I'm not going to tell on my friend."

Additionally, the defendant told his friend, Andrew Aviles, that he had "hit" the victim by mistake. The defendant further explained, "[Collelo] drove me to the spot on Baltic Street. I knocked on the door a few times. I thought I heard someone [cocking] back a hammer, so I shot like nine shots through the door and took off

. . . . I guess she was just unlocking the door or something.''

Finally, in an interview with the lead investigator on the case, the defendant revealed that he knew the victim's killing involved shooting through a door, despite the fact that the police previously had not alerted the defendant to this detail of what had occurred during the shooting.

The defendant was arrested on February 4, 2015, and subsequently charged with murder in violation of General Statutes § 53a-54a (a), and criminal possession of a firearm in violation of General Statutes § 53a-217. Following a jury trial, the jury found the defendant guilty of murder, and the court found him guilty of criminal possession of a firearm. The defendant received a total effective sentence of fifty-eight years of incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court erroneously admitted video recorded statements into evidence under *State* v. *Whelan*, supra, 200 Conn. 743, and, simultaneously, admitted those same statements as impeachment evidence without instructing the jury how to evaluate that evidence. We conclude that the defendant's claim is inadequately briefed and decline to review it.

The record reveals the following relevant facts. On January 4, 2015, Jeremy Dawson provided police with a written statement regarding the disclosure the defendant previously had made referencing his involvement in the victim's murder. The making of the statement was video recorded. Dawson's statement inculpated the defendant in the victim's murder.[1] At trial, Dawson testified that the contents of the written statement and the video recording were not true and that he was coerced by police into making the statement. The state moved to admit both Dawson's written statement, and the video recording of the statement. Defense counsel objected to the admission of the video recorded statement for several reasons. First, defense counsel posited that, because Dawson claimed he was coerced by police and, therefore, did not endorse the statement as his own, the statement could not be admitted under *Whelan*. Second, defense counsel argued that, if the video recorded statement was admitted, the jury must be instructed as to which portions of the video recorded statement could be used substantively and which portions could be used for impeachment purposes. Over defense counsel's objection, the court admitted both exhibits under *Whelan* as prior inconsistent statements. After admitting the exhibits, the court provided counsel with the opportunity to provide draft jury instructions with regard to the *Whelan* statements. The court noted: "I will hear from counsel, certainly, at some point if

they wish to ask for some kind of an instruction from the court. I haven't received any request to charge for the instructions that the court is going to be giving at the end of the case. . . . If there are specific instructions that either side wishes to ask the court to give either during or at the end of the case, I would expect counsel to make those requests."

In addition, William Collelo provided to police three statements regarding the victim's murder; two on November 20, 2014, and one on January 7, 2015. All three statements inculpated the defendant in the victim's murder. At trial, Collelo testified that the information in the three police statements was false and "all lies." Collelo testified that the police coached him through the statements, and that he felt pressured to provide the statements because the police were harassing him and his family. In addition to the three written statements, the state also moved to admit a video recording of Collelo's January 7, 2015 statement. The state offered the video recorded statement under *Whelan* because the video recording contained statements that were inconsistent with Collelo's in-court testimony. Further, the state argued that the video recorded statement should be admitted for the jury to make a determination as to whether the police coerced Collelo. Defense counsel objected to the admission of Collelo's video recorded statement on multiple grounds. First, defense counsel argued that the video recording contained statements consistent with those made by Collelo in court, and that consistent statements should not be admitted under *Whelan*. Second, defense counsel argued that, if the video recorded statement was admitted, the court should instruct the jury as to which portions of the video recorded statement could be used to impeach Collelo as to his claim of police coercion. Defense counsel noted, "[a]bsent some instruction from the court as to what the usefulness and the utility is of a video . . . and what portions they can use for what, I think we're taking a big chance here. . . . The jury needs some direction, some instruction as to how it's to consider a piece of evidence . . . ." The court responded that "if counsel think it would be helpful to the jury at this stage to provide some preliminary instructions with regard to their use of the video, I'm happy to consider any specific language that counsel wants to suggest." In response to the court's offer, defense counsel noted, "I'm not going to take part in curative instructions . . . . I leave that to the court to supply whatever instructions the court feels are appropriate." The court ultimately admitted the video recorded statement under *Whelan*, ruling that "by disavowing the sum total of his cooperation with the police, [Collelo's] testimony is inconsistent with the videotaped interview." Further, the court ruled that the video recorded statements were wholly admissible under *Whelan* as they were inconsistent with the testi-

mony of the two witnesses in court that their prior statements were both false and coerced.

Immediately following the court's admission of the Collelo video recorded statement, defense counsel again raised the instructional issue, noting, "I suppose . . . the only thing you could do would be a line-by-line analysis . . . and then almost instruct . . . the jury in sections as to how it may use each piece of a video . . . ." Defense counsel, however, did not provide the court with a proposed instruction or suggest which portions of the video recorded statements he believed should be considered as substantive evidence and which portions of the video recorded statements should be considered for impeachment purposes. The court responded that "it will be the jury's determination as to what weight to give the evidence and I do intend to give them instructions as to how to evaluate *Whelan* evidence as well as inconsistent and even prior consistent statements." Further, before the court allowed Collelo's video recorded statement to be played for the jury, the state offered specific redactions, to which the defense agreed. The defense offered no further redactions of its own.

On January 27, 2017, after both video recorded statements were shown to the jury, the court provided to the jury preliminary instructions distinguishing the use of prior inconsistent statements and the use of Dawson's and Collelo's *Whelan* statements, which had been admitted as exhibits. The preliminary instructions read as follows: "[E]vidence has been presented that some witnesses have made statements outside of court that may be inconsistent with their trial testimony. You should consider this evidence only as it relates to the credibility of the witnesses' testimony, not as substantive evidence. In other words, consider such evidence as you would any other evidence of inconsistent conduct in determining the weight to be given to the testimony of the witnesses in court.

"Further, in evidence as certain exhibits are prior statements of the witnesses. To the extent, if at all, you find such statements inconsistent with the witnesses' trial testimony, you may give such inconsistency the weight to which you feel it is entitled in determining the witness's credibility here in court. You may also use such statements for the truth of their content and find facts from them."

Also on January 27, 2017, the court provided counsel with a draft final charge, which incorporated in substance the preliminary charge it had given the jury.

On February 1, 2017, prior to the court's delivery of the final charge, defense counsel raised the issue of instructional language for the *Whelan* statements, noting, "I do think that this charge is lacking . . . ." Counsel went on to state, "I haven't necessarily an objection

to this language, but I can tell you that it's just not sufficient . . . ." The court responded that "I am going to give the two charges on inconsistent statements and on the *Whelan* rule. . . . I think that the jury can be guided by these two instructions . . . . And it is certainly . . . up to [the jury] to determine how they treat any particular piece of evidence and within the boundaries of these instructions, so I think that it sufficiently gives [the jury] the guidance that they need to be able to do that."

The trial judge delivered its final charge on February 1, 2017, at the close of trial. The final charge regarding inconsistent statements and *Whelan* statements read as follows: "Now, evidence has been presented that some witnesses made statements outside of court that are either consistent or inconsistent with their trial testimony. You should consider this evidence only as it relates to the credibility of the witness's testimony, not as substantive evidence. In other words, consider such evidence as you would any other evidence of consistent or inconsistent conduct in determining the weight to be given to the testimony of the witness in court.

"In evidence as exhibits 92 and 93 are prior statements of Jeremy Dawson. Also in evidence as exhibits 96, 97, 98, and 99 are prior statements of William Collelo. To the extent, if at all, you find such statements inconsistent with the witness's trial testimony, you may give such inconsistency the weight to which you feel they are entitled in determining the witness's credibility here in court. You may also use such statements for the truth of their content and find facts from it."

Defense counsel did not take exception to this portion of the final charge.

In his brief, the defendant labels his first claim as evidentiary in nature and proceeds to set forth an abuse of discretion standard of review. In his convoluted analysis of the claim, however, the defendant does not challenge the admissibility of the statements under *Whelan*. Rather, the defendant's only contention is that the court had the obligation to instruct the jury as to which portions of the exhibits could be used for impeachment purposes and which portions could be used for substantive purposes. In particular, in his brief, the defendant states that "[t]he jury never knew what portions of the Dawson and Collelo tapes to use as evidence and which portions to use to discredit each man. They never knew because the trial court refused the defendant's request to tell them." The defendant goes on to argue that "there was no limiting instruction despite a timely, proper request for one."[2]

In its brief, the state expresses its confusion over the nature of the defendant's claim, referring to the defendant's briefing of the first issue as "a confusing mélange of evidentiary complaints and instructional

challenges." The defendant's lack of clarity in his brief is reflected by the state's decision to analyze the defendant's first claim as both a claim of evidentiary error and a claim of instructional error.

In his reply brief, the defendant, responding to the state's confusion as to the nature of his claim, confirms that his claim is evidentiary in nature. Specifically, the defendant states that he "is not raising a jury instruction issue" and that "the . . . claim is evidentiary . . . ." Despite the defendant's contention, his reply brief offers no analysis of whether the court properly admitted the video recorded statements under *Whelan*, but, rather, continues to advance an undeveloped claim of instructional error.

The defendant's brief is also inadequate with regard to the Practice Book rules of appellate procedure. The state notes, and we agree, that, if the defendant is asserting a claim of evidentiary error, then his brief failed to comply with the requirements under Practice Book § 67-4 (e) (3).[3]

"It is well settled that [w]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *Clelford* v. *Bristol*, 150 Conn. App. 229, 233, 90 A.3d 998 (2014).

It is not the proper role for this court to guess as to the nature of the defendant's claim and the relevant legal analysis to apply thereto. We only have in front of us a muddled analysis that labels a claim as evidentiary in nature, yet predominantly analyzes it as instructional in nature. Accordingly, relying, as we must, on the defendant's insistence that he raised only an evidentiary claim, we conclude that this claim is inadequately briefed, and we decline to review it.[4]

## II

Next, the defendant claims that the court erroneously admitted into evidence a handgun magazine that was irrelevant, highly prejudicial, and misleading. We disagree.

The following procedural history is relevant. On Janu-

ary 10, 2017, the defendant filed a motion in limine to "preclude the state from introducing any evidence concerning an underwater search of the basin of the Thames River by Connecticut State Police." In particular, the defendant sought to exclude the handgun magazine recovered during the underwater search. On January 19, 2017, the trial court heard arguments on the motion from both parties. The state made an offer of proof regarding the relevance of the magazine as it related to evidence the state anticipated admitting. The state's offer of proof was as follows: "The state anticipates the evidence generally being that shortly after the homicide of Jaclyn Wirth, the defendant encountered an individual named Luis Burgos. Luis Burgos said that he acquired a gun from the defendant, and that Luis Burgos soon thereafter became nervous about possessing the firearm because he believed it may have been involved in the homicide. Shortly after becoming nervous, he indicates that he went to the area of the Thames River in Ledyard, broke the gun down into three different pieces, and threw the gun and its separate parts into the water. Some years later . . . he gave this information to investigators; at the time, he was incarcerated. The state made arrangements to have correction officers . . . bring him to the area of the Thames River, and indicate where it is that he says that he broke the gun into its components and threw it into the river.

"Shortly thereafter, the state of Connecticut sent a dive team to search the area. As part of the dive, they recovered an item, which we assert is a magazine. We have then sent that magazine to [ATF], it was inspected by an examiner . . . who is on the witness list, and he is prepared to tell us that it's an aftermarket magazine that would fit a Beretta, which is consistent with a weapon that would have fired, we believe the evidence will be, the fatal shot into Jaclyn Wirth, as well as the cartridges left at the scene, and the various shots into her as well as into the apartment. That would be our offer of proof as to why that magazine is admissible."

In support of its motion, defense counsel argued that, due to the size of the Thames River and the time elapsed since the crime, the recovered magazine could not be connected to the present case. The state countered that defense counsel's arguments went to the weight and not the admissibility of the magazine and that the magazine would corroborate Burgos' testimony. The court denied the defendant's motion on January 20, 2017. In denying the motion, the court found that "the proffered evidence is relevant and material . . . as it relates to the testimony of Mr. Burgos, is relevant to his credibility, and to the determination of credibility that the jury is going to have to make in this case. It's also ultimately relevant to whether or not the defendant had the means to commit the crime in question." The court further found that the defendant's

arguments regarding the magazine's admissibility could be explored on cross-examination and went to weight and not admissibility. The court also found that "the evidence is not unduly prejudicial, and does not unduly arouse the jury's emotions, hostility, sympathy, or otherwise create a danger of unfair prejudice." Throughout the remainder of trial, the state presented evidence consistent with its offer of proof regarding the admission of the handgun magazine.[5]

We begin our analysis of this claim with the appropriate standard of review. "It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Internal quotation marks omitted.) *State* v. *Papineau*, 182 Conn. App. 756, 787, 190 A.3d 913, cert. denied, 330 Conn. 916, 193 A.3d 1212 (2018).

"[R]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . . All evidence adverse to a party is, to some degree prejudicial. To be excluded, the evidence must create prejudice that is undue and so great as to threaten injustice if the evidence were to be admitted." (Citations omitted; internal quotation marks omitted.) *State* v. *Bullock*, 155 Conn. App. 1, 40, 107 A.3d 503, cert. denied, 316 Conn. 906, 111 A.3d 882 (2015); see also Conn. Code Evid. §§ 4-1 and 4-3.

Having examined the defendant's claim, we conclude that the court properly admitted the magazine into evidence because it tended to show that the defendant had access to a firearm shortly after the victim's murder,

it supported the conclusion that the magazine belonged to the firearm used to kill the victim, and it corroborated the state's theory of the case. Specifically, the magazine corroborated Burgos' testimony that the defendant sold Burgos a handgun on the morning of the victim's murder. Further, the dive team's ability to recover the magazine at Burgos' direction corroborated Burgos' testimony that he had thrown the disassembled handgun into the Thames River after learning of the victim's death later that morning. The state's witness who performed the underwater search testified that, as part of an investigatory search, it is "[n]ot overly common" to find the item for which the dive team is looking. Notably, the dive team, in its five day search, did not recover any other firearms evidence, further supporting the conclusion that the recovered magazine was, in fact, the one thrown into the river on the morning of the victim's murder. Perhaps most importantly, the admission of the magazine was relevant because an ATF examiner determined that the recovered magazine was consistent with a magazine that would fit a Beretta style handgun, which is the type of handgun used to kill the victim. The admission of the magazine, therefore, tended to support the state's theory that the magazine could have been used in the firearm the defendant used to kill the victim. We agree with the court's conclusion that defense counsel's arguments went to the weight of the evidence, not to its admissibility, and that defense counsel was able to explore those arguments on cross-examination.[6]

We disagree with the defendant's contention that the facts of *State* v. *Moody*, 214 Conn. 616, 573 A.2d 716 (1990), are analogous to the present case. In *Moody*, our Supreme Court concluded that the trial court erred in admitting into evidence the result of a "presumptive test for blood." (Internal quotation marks omitted.) Id., 628–30. In particular, the result of the "presumptive test for blood" was positive for a stain on the soles of the defendant's shoes. (Internal quotation marks omitted.) Id., 627. Our Supreme Court held that the presumptive test result "was entirely irrelevant" as it "did nothing toward establishing the likelihood of the presence of human blood on the sole of the defendant's shoe." Id., 628. Whereas in *Moody*, the presumptive test result could not demonstrate whether the stain was "human blood, animal blood, or something other than blood"; id; and, thus, was evidence that lacked any probative value, here, the ATF examiner determined that the recovered magazine matched the type of magazine used in the firearm used to kill the victim, and the recovery of the magazine corroborated Burgos's testimony. Therefore, the magazine was relevant and probative because its admission aided the trier of fact in determining a material fact or in corroborating other direct evidence in the case.

The defendant also argues that the court improperly

admitted the magazine because, due to the substantial corrosion and marine growth found on the magazine, the magazine was not in substantially the same condition as when the crime was committed. The defendant takes the position that "[t]he magazine was so hopelessly degraded that it was not reliable evidence for the jury to form any link between it and Wirth's murder." In supporting its proposition, the defendant mistakenly relies on *State* v. *Johnson*, 162 Conn. 215, 292 A.2d 903 (1972). The relevant fifth claim in *Johnson*, however, focused on the preservation of evidence with regard to tampering, intermeddlers, and custody. Id., 232–33. Specifically, in *Johnson*, the defendant claimed that the court erred in admitting marijuana into evidence because "not all the individuals having access to the exhibits were called and the exhibits were not sealed or labelled in such a way as to avoid the possibility of tampering or misplacement . . . ." (Internal quotation marks omitted.) Id., 230. Here, the state presented evidence that the magazine was in a different condition when it was recovered from the Thames River from the time of the commission of the crime, namely, that it was "highly corroded" and surrounded by "numerous types of marine-like material . . . ." The state's witnesses explained, however, that the magazine's physical changes were due to natural causes as a result of the magazine being submerged in the Thames River, and not due to the types of human activity that occurred in *Johnson*.

In light of the broad discretion possessed by trial courts in admitting evidence, we conclude that the trial court did not abuse its discretion in admitting the magazine.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Pursuant to *State* v. *Carrion*, 313 Conn. 823, 837, 100 A.3d 361 (2014), "[i]n addition to signed documents, the *Whelan* rule also is applicable to tape-recorded statements that otherwise satisfy its conditions." (Internal quotation marks omitted.)

[2] The defendant also claims on appeal that portions of the video recorded statement contained police statements that were untrue, hearsay or irrelevant, but at trial, he expressed only one specific objection relating to misinformation about nonexistent polygraph results, which the court instructed the jury to ignore as untrue. It was the defendant's obligation to identify other specific parts of the video recorded statements he found objectionable, which he failed to do, or to seek specific redactions or special instructions as to portions of the video recorded statements that did not contain *Whelan* statements, which he also declined to do.

[3] Practice Book § 67-4 (e) (3) requires: "When error is claimed in any evidentiary ruling in a court or jury case, the brief or appendix [of the appellant] shall include a verbatim statement of the following: the question or offer of exhibit; the objection and the ground on which it was based; the ground on which the evidence was claimed to be admissible; the answer, if any; and the ruling."

[4] Even when we pointed out to counsel during oral argument that the defendant's claim appeared to be instructional in nature, he insisted that it was not. Instead, he maintained that the defendant was making only an evidentiary claim.

[5] Although Burgos testified that he thought the handgun the defendant had sold him was a Llama, the question of whether Burgos accurately

recalled the make of the firearm goes to the weight of the state's evidence, not its admissibility. In its closing argument, the state argued that Burgos shrugged when testifying as to the handgun's markings and that Burgos did not correctly remember the brand of firearm.

[6] On cross-examination of the state's witness who recovered the magazine, defense counsel inquired into a number of issues on which he premised his motion to exclude the magazine. In particular, defense counsel inquired as to the amount of time the magazine was submerged, the tidal patterns of the Thames River, and the inability of the expert to attribute definitively the magazine to the victim's murder.

———————————————